```
SPECIAL MASTER
HON. DOUGLAS K. WOLFSON, J.S.C. (RETIRED)
C/O EMILY A. KALLER, ESQ.
GREENBAUM, ROWE, SMITH & DAVIS LLP
99 Wood Avenue South
Iselin, New Jersey 08830
(732) 476-3352
```

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., et al., | CIV. ACTION NO. 3:18-cv-493 (MAS)(LHG) |
| Plaintiffs, | **CIVIL ACTION** |
| v. | **On Cross-Motions for Judgment on the Pleadings** |
| AIG INSURANCE COMPANY OF CANADA, et al., | |
| Defendants. | |

### REPORT & RECOMMENDATION OF THE SPECIAL MASTER

Sherilyn Pastor of McCarter & English and John E. Failla, Nathan Lander, Seth D. Fiur, Om V. Alladi of Proskauer Rose LLP on the brief and arguing the cause for Plaintiffs Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International, and AMGS, Inc

Shawn L. Kelly, Jonathan D. Henry, Kelly Lloyd Lankford of Dentons US LLP and Frank P. Arleo, Jo Ann K. Dobransky of Arleo & Donohue, on the brief for Defendant AIG Insurance Company of Canada

Kevin T. Coughlin, Suzanne C. Midlige, of Coughlin Duffy, LLP on the brief, Suzanne C. Midlige arguing the cause for Defendant Allianz Global Risks US Insurance Company
Paul R. Koepff, Leonard Sarmiento and Roderic McLaughlin of Clyde & Co. on the brief for Defendants Certain Underwriters at

Lloyd's, London subscribing to Policy Numbers QB078513 and
B0509FINMW1500609 (collectively, "Allied World")

Joseph J. Schiavone, Jeffrey S. Leonard and David I. Satine of
Saiber LLC on the brief for Defendant Everest Insurance Company
of Canada

Robert A. Benjamin and Patrick Stoltz of Kaufman Borgeest & Ryan
LLP on the brief for Defendant Hartford Fire Insurance Company

Steven M. Rosato, Joseph G. Finnerty, III and John Vukelj of DLA
Piper LLP (US) on limited brief for Defendant Temple Insurance
Company


Melissa J. Brown and Sean X. Kelly of Marks, O'Neill, O'Brien,
Doherty & Kelly, P.C. and David A. Wilford, Sabina B. Danek and
Anthony J. D'Agostino of Wilford LLP on limited brief for
Defendant Certain Underwriters at Lloyds, London subscribing to
Policy QB146013 ("MS Amlin"); Certain Underwriters at Lloyd's,
London subscribing to Policy No. QB078613, who have been
incorrectly named (by Plaintiff) as "Lloyd's Syndicate CVS
1919"; Liberty International Underwriters, a division of Liberty
Mutual Insurance Company; Certain Underwriters at Lloyd's,
London subscribing to Policy No. QB078913, who have been
incorrectly named (by Plaintiff) as "Lloyd's Syndicate QBE 1886"
and "Lloyd's Syndicate ANV 1861"; and Royal & Sun Alliance
Insurance Company of Canada

Daniel J. Layden and Thomas Brown of Hangley Aronchick Segal
Pudlin & Schiller on behalf of Arch Insurance Canada Ltd.

### TABLE OF CONTENTS

<u>Page</u>

INTRODUCTORY STATEMENT............................................1

BACKGROUND FACTS..................................................2

      A.   The Allergan Actions.............................5

      B.   Valeant's Plan to Acquire Allergan..............8

      C.   Valeant's Tender Offer..........................11

      D.   The Allergan Plaintiffs' Claims.................12

      E.   Judge Carter's Analysis of Alleged
          Securities Violations...........................15

      F.   Valeant's D&O Policy............................17

THE PARTIES' POSITIONS...........................................20

      A.   Valeant's Motion and Position...................20

      B.   Defendants' Cross-Motions and
          Positions.......................................25

DISPOSITION......................................................28

      A.   Legal Standard For Motion For Judgment
          on the Pleadings................................29

      B.   The Allergan Actions............................31

      C.   "Securities Claims" Under The 2013-14
          Policies........................................36

      D.   Discussion......................................36

          1.   The Policies Cover Valeant as an
              "Organization"...........................39

          2.   The SAC Alleges "A Violation of
              Law."....................................39

          3.   The Allergan Plaintiffs' Claims
              Were Brought By "Any Person or
              Entity.".................................43

4.    The Allergan Plaintiffs' Claims "Allege, Arose Out Of, Were Based Upon Or Attributable To" The Sale of Securities............................ 44

5.    The Allergan Plaintiffs' Claims Arise From "The Purchase or Sale or Offer to Purchase or Sell" Securities of the Organization........... 58

6.    The Allergan Plaintiffs' Claims Allege An "Offer To Sell" Valeant Securities............................. 63

7.    The Perils of a Moral Hazard In This Case Are Overstated and Insufficient to Warrant a Denial of Coverage............................ 64

8.    The Consequence of Claims of Allergan Plaintiffs Falling Outside the Allergan Actions Class Period.................................. 69

9.    There Are No Disputed Material Facts That Prevent Entry of Judgment On The Pleadings................ 71

CONCLUSION AND RECOMMENDED ORDER............................72

APPENDIX....................................................74

Wolfson, D., (J.S.C., Ret'd.) Special Master:

### INTRODUCTORY STATEMENT

This matter comes before me upon a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), (ECF No. 233) brought by Plaintiffs, Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International and AGMS, Inc. (collectively "Valeant"), and a cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), (ECF No. 238) brought by Defendant AIG Insurance Company of Canada ("AIG Canada") and joined in by certain other excess carrier Defendants[1] all of whom seek the entry of Judgment on the

---

[1] Defendants Allianz Global Risks US Insurance Company ("Allianz"), Certain Underwriters at Lloyd's, London subscribing to Policy Numbers QB078513 and B0509FINMW1500609 (collectively, "Allied World"), Everest Insurance Company of Canada ("Everest"), and Hartford Fire Insurance Company ("Hartford") have all submitted papers joining in AIG's cross-motion. For purposes of this Opinion, the aforementioned defendants together with AIG Canada will be referred to as the "Cross-Moving Defendants." Defendants Temple Insurance Company ("Temple") and Certain Underwriters at Lloyds, London subscribing to Policy QB146013 ("MS Amlin") note their participation in these motions is limited given that the Court previously "dismiss[ed] Count Five of the complaint with prejudice as to Temple and MS Amlin." ECF No. 195, 4/12/19 Mem. Op. at 6. *See*, ECF 240, filed 6/30/2020. Defendants AIG Canada and Certain Underwriters at Lloyd's, London Subscribing to Policy Numbers QB078513 and B0509FINMW1500609 ("Allied World") have advised on June 1, 2021 and June 2, 2021, respectively, that they have reached settlements with Plaintiffs and will not be participating in oral argument. While AIG Canada is the insured that issued the primary policy, the policies of the excess carriers "followed form" of the AIG Canada policy. Accordingly, the remaining excess carriers are continued proponents of the arguments advanced in briefs submitted by AIG Canada.

Pleadings with respect to Count V of Valeant's Complaint.

Resolution of these motions essentially requires a determination of whether or not the Allergan Actions constitute "Securities Claims," as defined under the terms of certain insurance policies, thus triggering coverage. The Hon. Michael Shipp, U.S.D.J. referred both motions to me as the Special Master for a Report and Recommendation. Following the receipt and review of the parties' submissions, oral argument was held on June 3, 2021. Upon careful consideration of the parties' Briefs and Reply Briefs, the arguments of counsel, and for the reasons stated below, it is the recommendation of the Special Master that PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS pursuant to Fed. R. Civ. P. 12(c) with respect to Count V of the Complaint and contrary Affirmative Defenses and Counterclaims BE GRANTED and that DEFENDANTS' CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS on Count V of the Complaint BE DENIED.

## BACKGROUND FACTS

These Motions relate to whether insurance coverage exists under Valeant's Directors and Officers Liability Insurance ("D&O") policy for the 2013-2014 policy period, through which Valeant seeks to recover moneys paid to defend and, ultimately,

to settle two class actions,[2] consolidated under the caption *In re Allergan, Inc. Proxy Violation Sec. Litig.*, Case No. 8:14-cv-02004-DOC-KES (the "Allergen Actions").[3]  These class actions related to Valeant's attempted takeover of Allergan, Inc. through an exchange of Valeant stock and cash for Allergan, Inc. stock.  As a result, Valeant notified AIG Canada and the excess insurers of the Allergan Actions and demanded coverage for

---

[2]  While Valeant argues that Quebec law applies and has included an occasional reference to Quebec law in its briefing, the parties have generally relied upon New Jersey and federal law in advancing their respective positions in these cross-motions. *See* Plaintiff's Moving Brief at 24 n.17.   I am aware that Valeant asserts and Defendants deny that Quebec law applies because under Quebec law the policy limits may be used solely to satisfy judgments or settlement payments and may not be offset by defense costs.  Plaintiff's Moving Brief at 4, n.4.  This is not before me in the pending motions and I express no opinion on this issue.

[3]  These facts are derived from the Second Amended Complaint ("SAC") in the Allergan Actions (ECF 233-16 and Exhibit N to the Certification of Sherilyn Pastor dated April 23, 2020 ("Pastor Cert.") (ECF 233-2)), the Order Re Motion to Certify Class in the action *Basile v. Valeant Pharmaceutical International, Inc.*, SACV-14-2004-DOC (ECF 229); the Judgment Approving Class Action Settlement (ECF 233-19 and Exhibit Q to the Pastor Cert.) ("Carter Op."), and Valeant's Complaint in this coverage action. (ECF 1-1) ("Compl.")  A court may take judicial notice of another court's opinions "to establish the nature and scope" of other proceedings and the ruling of the other court. *See, e.g., Kaul v. Christie*, 372 F. Supp. 3d 206, 229 (D.N.J. 2019), *appeal dismissed*, No. 19-1651, 2019 WL 4733531 (3d Cir. June 20, 2019); *Somerset v. New Jersey*, No. CV 17-993 (KM), 2018 WL 6705698, at *3 (D.N.J. Dec. 20, 2018); *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, No. CIV.A. 11-4429 JLL, 2012 WL 1574301, at *8 (D.N.J. May 3, 2012), *aff'd*, 525 F. App'x 94 (3d Cir. 2013); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009). Valeant disputes Judge Carter's factual findings.

-3-

itself and its Chief Operating Officer, J. Michael Pearson ("Pearson"). (ECF 1-1 ¶ 78)

AIG Canada's policy provided a coverage limit of $10 million in excess of a $5 million deductible. Various excess carriers (the co-defendants in this litigation) provided the remaining $140 million in coverage limits pursuant to a series of excess policies, (collectively referred to as the "Policies"). See Appendix A.   AIG Canada and certain excess carriers acknowledged coverage for Pearson but denied coverage for Valeant itself, claiming that the actions were not "Securities Claims" as required and defined by those Policies. (ECF 83-84 at Sixth Affirmative Defense.)[4]

On December 7, 2017, Valeant initiated this action asserting claims of breach of contract and for declaratory judgment in the Superior Court of New Jersey, Somerset County. On January 12, 2018, the case was timely removed to the District Court.

On April 23, 2020, Valeant moved under *Fed. R. of Civ. Pro.* 12(c) for judgment on the pleadings as to Count V of its Complaint and the corresponding Affirmative Defenses and

---

[4] As set forth in footnote 1, although AIG Canada has reached a settlement with Plaintiffs and is no longer in the case, because the policies of the remaining excess carriers "follow form" of AIG Canada's primary policy, the issues raised in this motion are not moot.

Counterclaims asserted by AIG Canada and the excess insurers.[5] The pivotal issue here is whether or not the claims asserted in the Allergan Actions meet the Policies' definition of "Securities Claims".

### A.   The Allergan Actions

The underlying Allergan Actions alleged that Valeant and a hedge fund management company, Pershing Square Capital Management L.P. ("Pershing"), engaged in insider trading and front-running by creating and implementing a plan, in furtherance of which, Pershing secretly acquired a "toe-hold" in Allergan, Inc. stock in advance of a tender offer it knew was to be made by Valeant for Allergan.[6]

Plaintiffs in the Allergan Actions are former Allergan shareholders who sold their Allergan common stock between February 25, 2014 and April 21, 2014, the day prior to the

---

[5] The insurers under the Policies allege that the Allergan Actions do not constitute covered Securities Claims in their affirmative defenses and counterclaims for declaratory relief. *See* ECF No. 2 ("Hartford Answer and Counterclaim") at pp. 40, 53 ¶¶ 31-32; ECF No 19 ("Certain Defendants' of Lloyds' Counterclaim") at p. 21 ¶¶ 64-65; ECF No 20 ("Certain Defendants' of Lloyds' Answer") at p. 81; ECF No. 80 ("Allianz Answer") at p. 31-32; ECF No. 83 ("Everest Answer") at p. 32; ECF No. 84 ("AIG Answer") at p. 39; ECF No. 87 ("Temple Answer and Counterclaim") at pp. 33, 50 ¶¶ 48-49; ECF No. 88 ("AWAC Answer and Counterclaim") at pp. 28, 45 ¶¶ 171-72; ECF No. 89 ("Arch Answer and Counterclaim") at pp. 32, 43 ¶¶ 30-31. (Collectively, "Affirmative Defenses and Counterclaims.")

[6] Pershing used "PS Fund 1," described as a funding vehicle, to acquire the Allergan shares. (SAC at ¶ 6).

public announcement by Valeant of its takeover proposal for Allergan. [Second Amended Complaint ("SAC"), ¶ 19] "The core of Plaintiffs' insider trading allegations is that [Valeant and Pershing] withheld information and improperly traded on that information—that is the root of the harm." (Certification of Shawn L. Kelly, dated June 30, 2020 at Ex. 1, Order Re: Motion to Certify Class)(hereinafter "Kelly Cert."). Pursuant to the secret agreement between Valeant and Pershing, Pershing was to vote its Allergan shares in favor of Valeant's takeover.

However, the goals of this alleged cabal were thwarted when Allergan refused to sell its stock to Valeant. Thus stymied, Valeant resorted to orchestrating a hostile takeover of Allergan, although that, too, failed following Valeant's public disclosure of its tender offer. Ultimately, Allergan merged with a competing pharmaceutical company, (SAC at ¶¶ 177-78), and the transaction in Valeant securities was never consummated.

The Allergan Plaintiffs brought three causes of action against Valeant:

(1) A Williams Act claim under Section 14(e) of the Securities Exchange Act ("Exchange Act"), alleging Valeant unlawfully communicated non-public information to Pershing regarding its planned tender offer, leading to the Allergan Plaintiffs' underpriced sale of their stock to Pershing

-6-

while Pershing possessed knowledge of the non-public information (SAC ¶ 198); and

(2) Two separate Claims under Section 20A of the Exchange Act for communicating non-public information to Pershing regarding its planned tender offer under circumstances which would reasonably and foreseeably result in a Section 14(e) (Rule 14e-3) violation. (SAC ¶ 212)

The Allergan Plaintiffs alleged they sold their shares for "less than the market would have valued the shares" if the market had the same knowledge of Valeant's proposed tender offer as did Pershing, (Kelly Cert. Ex. 1 at 10), and that they relied on the integrity of the market, which was presumed to be:

(1) determined by ordinary supply and demand; and

(2) free from distortion, manipulation or insider trading based on non-public material information. (SAC ¶ 189)

As contended by the Allergan Plaintiffs, Pershing was required either to disclose the material non-public information regarding Valeant's tender offer, or to abstain from trading in Allergan stock. (SAC ¶ 189)) Instead, they allege that Pershing failed to disclose the non-public information regarding Valeant's intended takeover of Allergan and used this non-public knowledge "that a potential tender offer was on the horizon" to acquire thousands of shares of Allergan stock from Allergan

-7-

Plaintiffs at an artificially depressed price. (Kelly Cert. Ex. 1. at 10.)[7]

### B.   Valeant's Plan to Acquire Allergan

Following its unsuccessful attempt to purchase or merge with Allergan, Valeant apparently determined to seek its acquisition through a hostile tender offer. (See Tentative Opinion of David O. Carter attached to Declaration of Sherilyn Pastor dated April 23, 2020 ("Pastor Cert.") as Exhibit Q ("Carter Op.") at 3:22-4:7; 4:20-22.) In furtherance of this effort, Valeant took numerous affirmative steps toward its goal of acquisition. (SAC ¶¶ 12, 105.) It held multiple board meetings to discuss the combination. It hired law firms and bankers to perform due diligence.  It lined up financing. It met and signed a confidentiality agreement with Pershing, in which Valeant candidly revealed that Allergan was the proposed target. (Carter Op. at 46 & n.22.)   Judge Carter, who presided over the Allergan Actions, (see footnote 2 *infra*) held the SAC plausibly alleged that Valeant had thus taken substantial steps relating to the tender offer to expose it to tender offer-related

---

[7] Notably absent, according to Defendants, is a specific claim by the Allergan Plaintiffs that they sold or purchased, or were offered to purchase, Valeant stock.  Of course, given Pershing's acknowledged failure to disclose the non-public information, the Allergan Plaintiffs could not have known then of Valeant's alleged secret tender offer plan to acquire Allergan.

liability for its actions dating back to February 2014. (Carter Tentative Order, 2018 WL 3912934, at *14, *30 & n.22)

According to the Allergan Plaintiffs, Valeant sought a "toehold"[8] in Allergan to facilitate its takeover plans, (Id.), and alleged further that since Valeant lacked the cash to purchase stocks sufficient to establish this toehold itself, it also sought to avoid the added expense of enlisting the aid of an investment bank. (SAC ¶ 69, 143)

Instead, on February 9, 2014, Valeant sought out Pershing, and advised it about its plan to acquire Allergan. (SAC ¶ 43) On February 25, 2014, Valeant's CEO, J. Michael Pearson, and William Ackman, (the founder of Pershing), entered into a "Relationship Agreement," in furtherance of Valeant's scheme to acquire Allergan. (SAC ¶ 5) In exchange for that valuable information (which enabled Pershing to buy low and sell high), the Allergan Plaintiffs allege that Pershing agreed to acquire a 10% toehold in Allergan and thereafter to vote those shares in support of Valeant's takeover bid. (SAC ¶ 1) Pershing also agreed that immediately prior to consummating any tender offer, Valeant could, at its sole option, require Pershing to purchase $400 million of Valeant stock if the tender offer were

---

[8] "Toehold" refers to the practice of acquiring an initial block of stock in the target company prior to attempting a hostile takeover. (Carter Op. 4:15-22)

consummated (Carter Op. at 12), and that if the tender offer was consummated and Pershing had a choice, it would elect to receive Valeant stock in exchange for the Allergan shares it had acquired.[9]   (Carter Op. at 12) Of significance to Cross-Moving Defendants, Valeant did not intend to takeover Allergan through its tender offer until late May 2014, well after Pershing had concluded its insider trading. (Carter Op. at 39)

The Allergan Plaintiffs[10] alleged that Valeant's takeover plan was not public, and that both Pershing and Valeant agreed not to disclose it.[11] (SAC ¶ 202.) Pursuant to the Relationship Agreement, Pershing was to acquire Allergan stock in a manner

_____

[9] Valeant stock was thus a significant factor in, and part of, the transaction.   In his tentative finding that the Allergan Plaintiffs had established this element of their Williams Act claim, Judge Carter concluded that the Relationship Agreement between Pershing and Valeant required Pershing to vote the acquired Allergan shares in favor of Valeant's takeover bid, and accept only Valeant shares in exchange. Tentative Order, 2018 *WL* 3912934, at *30. Judge Carter noted "it is undisputed that Valeant did not have the available cash necessary to purchase a significant 'toehold' position in a large company like Allergan, . . ." *Id.*   Accordingly, the exchange of Valeant stock can reasonably be deemed an indispensable part of the proposed transaction.

[10] As stipulated by Valeant, the Allergan Plaintiffs were "[a]ll persons who sold Allergan common stock contemporaneously with purchases of Allergan common stock made or caused by Defendants during the period February 25, 2014 through April 21, 2014 . . . and were damaged thereby." (Kelly Cert. Ex. 1 at 8)

[11] The Allergan Plaintiffs devoted a significant portion of their Complaint to allegations supporting their assertion that Valeant took "substantial steps" towards a contemplated tender offer. (*See id.* ¶¶ 67-165).

that would not require disclosure without Valeant's consent. (Carter Op. ¶¶ 10:27-11:10.)

On February 25, 2014, Pershing began furtively purchasing Allergan stock. (SAC ¶ 5; Carter Op. 14:7-9)   Unaware of Valeant's contemplated takeover, the Allergan Plaintiffs allege they sold their Allergan stock in the open market at an artificially depressed price. Pershing's purchases were made prior to Valeant's tender offer. (Carter Op. 14:7-9)   By April 21, 2014, Pershing owned 9.7% of Allergan. (SAC ¶ 6)

If Valeant's tender offer succeeded, Pershing would swap its Allergan shares for Valeant shares.[12] If not, no shares of Valeant stock would change hands, but Pershing would pay Valeant 15% of the profits from the underpriced Allergan shares it had acquired with the benefit of the insider information of Valeant's proposed tender offer. (SAC ¶ 4.)

**C.   Valeant's Tender Offer**

On April 22, 2014, Valeant publicly disclosed its proposal to acquire Allergan.   Predictably, the price of Allergan stock rose and Pershing's ability to further capitalize on its insider knowledge of Valeant's proposed tender offer ended. (Carter Op.

---

[12] According to the Allergan Plaintiffs, Valeant and Pershing agreed that Pershing would use the shares of Allergan that it acquired to purchase Valeant stock. (SAC ¶ 171) The Allergan Plaintiffs alleged that Valeant "registered a pool of Valeant shares that would be used to buy Pershing out of the Allergan stake that it built by front-running the tender offer." (SAC ¶ 171)

13:25-14:1) In its public proposal, Valeant offered to exchange an interest in Valeant stock, plus $48.30 in cash, in exchange for each share of Allergan tendered. (*Id.*) Allergan's Board rejected Valeant's offer. (SAC ¶¶ 126-154) Although Valeant increased the cash portion of its offer several times, these too, were unsuccessful as Allergan's Board rejected them all. (Id. ¶¶ 157-162) On June 18, 2014, Valeant filed a Form S-4 registration statement, and commenced the launch of a formal tender offer. (Id. ¶ 166) The S-4 advised that Valeant was seeking to purchase shares of Allergan from the shareholders in exchange for Valeant stock and cash. (SAC ¶ 7)  The Allergan Plaintiffs who had sold their Allergan stock prior to April 22, 2014 were foreclosed from this offer.

Predictably, Valeant's announcement resulted in a bidding war for Allergan.  When Valeant was ultimately outbid by a competitor, Actavis, it withdrew its tender offer. As noted by the Cross-Moving Defendants, because the tender offer was never consummated, no Allergan shareholders received shares of Valeant, and Valeant could not require Pershing to acquire Valeant stock pursuant to the financing option of the Relationship Agreement. (Carter Op. 2.)

**D.   The Allergan Plaintiffs' Claims**

The SAC in the Allergan Actions alleged three Claims for Relief against Pershing and Valeant:

1)  A Claim for violations of Sec. 14(e) of the Exchange Act and corresponding Rule 14e-3, which prohibit insider trading while in possession of material non-public information in connection with a tender offer.

2)  A Claim, derivative of the first, alleging a violation of Sec. 20A(a) of the Exchange Act; and

3)  A Claim alleging violations of Sec. 20A and Rule 14e-3 because defendants acted as "controlling persons" within the meaning of Section 20A of the Exchange Act.

None of these claims makes a single reference to Valeant securities.

The litigation was certified as a class action on March 15, 2017. The class was comprised of all Allergan shareholders who claimed they sold Allergan common stock between February 25, 2014 (the date Valeant and Pershing signed the Relationship Agreement) and April 21, 2014 (the day before Valeant's public takeover proposal) (the "Class Period") and were damaged by selling their Allergan stock without knowing of Valeant's takeover plan, its future tender offer, or that the tender offer involved an exchange for Valeant shares. The fact that no class member received the tender offer for the shares of Allergan stock sold during the Class Period, and that Valeant's offer was publicly disclosed only after the sale of the Allergan shares

occurred, are, according to the Cross-Moving Defendants, critical facts in their favor.

The Complaint does, however, make specific references to Valeant securities:

1) the offer by Valeant to purchase Allergan was to include an interest in Valeant stock, along with cash in exchange for Allergan shares;

2) if the tender offer was consummated, Valeant had the ability to require Pershing to purchase $400 million of Valeant stock at a 15% discount; and

3) Pershing agreed to accept Valeant securities in exchange for the Allergan shares it had acquired.

The Allergan Plaintiffs claimed that due to the insider trading, they sold their Allergan shares for an artificially low price, (SAC ¶206), and, had they known about the contemplated tender offer, they would have sold their shares at a higher price. Thus, the Allergan Plaintiffs sought damages, which they calculated to be the difference between the amount actually received for their Allergan shares and the closing price of Allergan shares on the day Allergan announced its merger with Actavis, a competing pharmaceutical company. (Carter Op. at 63.)

Defendants emphasize that the tender offer never came to fruition, and as such, no Valeant shares ever changed hands. However, Valeant's efforts to acquire Allergan indisputably

included exchanges of Valeant stock for Allergan stock. (*Id.* ¶¶ 126, 157). The Allergan Plaintiffs alleged throughout their complaints that Valeant's intent, as well as its ultimate offers to acquire Allergan -- predominantly through an exchange for Valeant stock[13] -- was the constant and motivating factor in all of its wrongful acts. (Exs. O-P: *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-2004-DOC-KESx (C.D. Cal.), ECF No. 1 (Complaint) at ¶¶ 11, 106; *id.*, ECF No. 60 (Amended Complaint) at ¶¶ 110, 141, 151, 154, 160.) As characterized by the Allergan Plaintiffs, Valeant "violated federal securities laws and regulations in connection with Valeant's tender offer." *See* Tentative Order, 2018 *WL* 3912934, at \*6.

### E.   Judge Carter's Analysis of Alleged Securities Violations

Following Judge Carter's review of the parties' cross motions for summary judgment in the Allergan Actions, he issued a preliminary Order which contained a number of findings:

> (1) that as the entity seeking to acquire Allergan shares in the tender offer, Valeant was an "offering person" for purposes of Williams Act liability. (Carter Op. 35-36.);

---

[13] The Allergan Plaintiffs alleged that 70 percent of the $46 billion in Valeant's initial offer was comprised of Valeant securities and that Valeant offered "over 240 million Valeant shares . . . as part of the tender offer consideration." (SAC ¶126, 170).

(2) that Valeant took substantial steps in furtherance of that tender offer, including: (a) retaining counsel and financial advisors; (b) conducting diligence into Allergan; (c) presenting the Allergan opportunity to Valeant's Board; and (d) negotiating and executing a Confidentiality Agreement with Pershing.[14] (Carter Op. at 46 n.22.); and

(3) that Pershing's unlawful insider acquisitions of Allergan shares were the transactions at the center of the case.

(Carter Op. at 66)

Valeant asserts that Judge Carter's ruling conclusively "establishes" that the claims raised in the Allergan Actions are Securities Claims under the Policies. Defendants, of course, assert to the contrary, and note that while the Judge did find insider trading had occurred with respect to Allergan stock, he rendered no opinion about whether the Allergan Plaintiffs' claims arose from, or related to, the purchase or sale of Valeant's stock, (emphasizing further that Judge Carter referred to Valeant securities only three times in his sixty-eight (68) page Opinion).

---

[14] Once an "offering person" has taken "substantial step[s]" towards a tender offer, Rule 14e-3 provides "any other person" in possession of material non-public information relating to the tender offer must either disclose that information or abstain from trading on it. 17 C.F.R. § 240.14e-3(a).

**F.   Valeant's D&O Policy**

Valeant was insured under a program of Directors and Officers Liability Insurance for the period September 28, 2013 to September 28, 2014 (the "2013-2014 Program"). As the primary policy for the 2013-2014 Program, AIG Canada issued Executive Edge Broad Form Management Liability Insurance Policy No. 01-421-57-69 (the "AIG Canada Primary Policy") to Valeant. The AIG Canada Primary Policy provided a $10 million coverage limit in excess of a $5 million retention. (Compl. ¶ 37.) Pursuant to Insuring Agreement C,[15] the coverage provided by the AIG Canada Primary Policy included "Organization Coverage." (Policy at 1.C.)

Specifically, Insuring Agreement C of the AIG Canada Primary Policy states, in relevant part:

> This policy shall pay the Loss of any Organization:

---

[15] In addition to providing Organization Coverage under Insuring Agreement C (referred to as "Side C Coverage"), the AIG Canada Primary Policy provided Individual Coverage to directors or officers not indemnified by the Company for claims against them in their official capacities pursuant to Insuring Agreement A (referred to as "Side A Coverage"). It also provided Corporate Reimbursement Coverage to Valeant for amounts paid as indemnification of its officers and directors pursuant to Insuring Agreement B (referred to as "Side B Coverage"). Defendants have acknowledged coverage for Pearson under Side B Coverage which does not require a "Securities Claim" as a prerequisite to being deemed within the scope of coverage. Defendants' Moving Brief at 17 n.9. Sides A and B are not at issue in this motion.

> (1) arising from any Securities Claim . . .
> made against such Organization for any
> Wrongful Act of such Organization…
>
> (Policy 1.C.).

The Policy defines "Securities Claim" in relevant part, as:

> A Claim, other than an administrative or
> regulatory proceeding against, or
> investigation of an Organization, made
> against any Insured:
>
> (1) alleging a violation of any law, rule or
> regulation, whether statutory or common law
> (including but not limited to the purchase
> or sale or offer or solicitation of an offer
> to purchase or sell securities), which is:
>
> (a) brought by any person or entity
> alleging, arising out of, based upon or
> attributable to the purchase or sale or
> offer or solicitation of an offer to
> purchase or sell any securities of an
> Organization[.]

(AIG Canada Primary Policy, Endorsement # 21).[16]

The Policy defines the term "Organization" as "the Named Entity," which is Valeant Pharmaceuticals International, Inc., and each Subsidiary. (Id., Definitions at 23.)

Thus, to constitute a "Securities Claim," as that term is defined by the AIG Canada Primary Policy, the underlying claim must allege a violation of a law, rule or regulation which alleges, arises out of, is based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell Valeant securities. As argued by the Cross-

---

[16] This definition of "Securities Claim" replaces the definition provided in the Definitions section of the Policy at 26.

Moving Defendants, absent either a sale or an offer to sell Valeant securities, and a connection between that sale or offer to sell Valeant securities and a violation of law, rule or regulation, there can be no "Securities Claim," and, therefore, no coverage under Insuring Agreement C of the AIG Canada Primary Policy.

In addition to the $10 million AIG Canada Primary Policy, the 2013-2014 Program also included policies issued by several other insurers for amounts in excess of the $10 million policy, which are also named as Defendants here (the "Excess Policies"), resulting in an effective coverage limit of $150 million. (Compl. ¶ 36-38)  A coverage chart of the 2013-2014 Program is included in an appendix annexed hereto.  Unless the Excess Policies specifically provide otherwise, the Excess Policies "follow-form" to AIG Canada's Primary Policy -- that is they incorporate the same insuring clauses, definitions, terms, conditions, exclusions and other provisions of the AIG Canada Primary Policy and other underlying insurance. (Id. ¶ 39.) Thus, as noted by Valeant, the excess insurers agreed to provide coverage to Valeant for "Securities Claims" as set forth in the Policies. *See* Valeant's Brief dated 6/30/20 at 19 n.11.

## THE PARTIES' POSITIONS

### A.   Valeant's Motion and Position.

Valeant's Motion seeks an Order for Judgment on the Pleadings with respect to Count V of the Complaint.   Count V provides:

### FIFTH COUNT
#### (Declaratory Judgment on Coverage: By All Plaintiffs Against the 2013-14 Insurers)

...

117. Under the 2013-14 Policies, the 2013-14 Insurers are required to pay all "Loss" arising from "Securities Claims" against the Plaintiffs and "Claims" against Plaintiffs' directors and officers.

118. The 2013-14 Claims constitute covered Securities Claims against the Plaintiffs and covered Claims against Valeant's former CEO Michael Pearson.

119. The 2013-14 Insurers have wrongfully denied coverage to Plaintiffs for the 2013-14 Claims.

120. Accordingly, an actual case or controversy exists between Plaintiffs and the 2013-14 Insurers regarding the obligations owed to Plaintiffs under the 2013-14 Policies.

**WHEREFORE,** Plaintiffs demand a judgment declaring and adjudicating that the 2013-14 Claims are covered under the 2013-14 Policies, together with whatever further relief the Court deems just and proper.

See Pl. Compl. at 36-37.

Valeant's claimed entitlement to judgment on the pleadings turns on whether the Allergan Actions are deemed "Securities

-20-

Claims," and thus specifically covered by the AIG Canada and the Excess Insurers policies.

The Policies define a "Securities Claim," as follows:

Under Paragraph 1(C) of the Policies, the Insurers agree to pay the "Loss of any Organization . . . arising from any Securities Claims . . . made against such Organization. . . ." See AIG Canada's Executive Edge Policy No. 01-421-57-69 ("Primary Policy") attached to Certification of Sherilyn Pastor dated April 30, 2020 ("Pastor Cert.") at Exh. A, at 1(C).

"Organization" is defined to include Valeant and its subsidiaries. Pastor Cert., Exh. A at 23. This provision is the focus of this motion.

The Policies define a "Securities Claim" as:

> a Claim, other than an administrative or regulatory proceeding against, or investigation of an Organization, made against any Insured:
>
> (1) alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:
>
> (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or
>
> (b) brought by a security holder or purchaser or seller of securities of an Organization with respect to such security

> holder's, purchaser's or seller's interest
> in securities of such Organization . . .

Pastor Cert., Exh. A at Endorsement 21.

Thus, the pivotal issue is whether the Allergan Plaintiffs brought claims "alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell" Valeant securities.

Valeant argues that the answer to this question is unequivocally yes. It points to specific allegations in the Allergan Plaintiffs complaint enumerating the multiple offers to sell Valeant Securities, (including the June 2014 tender offer), that constitutes the crux of the Allergan Actions, and without which, the Allergan Plaintiffs' legal theories against Valeant could not have succeeded.

Valeant submits that the gravamen of the SAC was its intended tender offer, mentioned more than 150 times in the Complaint, which spells out in painstaking detail the evolution of the tender offer scheme, and Valeant's multiple offers to sell its own securities to the hedge fund management company, Pershing.

Valeant also notes that the tender offer was not the only offer it made to sell its securities, and points to Valeant's agreement that required Pershing:

1) to purchase $400 million of Valeant shares at a 15% discount to finance the merger;

2) to vote its Allergan shares in favor of the takeover; and,

3) to exchange its shares for Valeant stock.

See Pl. Brief at 18-19.

Valeant also relies on the findings of Judge Carter in *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-02004-DOC-KESx, 2018 *WL* 3912934, at \*17 (C.D. Cal. Aug. 14, 2018). With respect to the Williams Act claim made by the Allergan Plaintiffs, Valeant states that Judge Carter acknowledged the Allergan Plaintiffs' burden and obligation to prove that "Valeant had taken 'substantial steps' to commence its tender offer." See Pl. Brief at 6 (citing Tentative Order, *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-02004-DOC-KESx, 2018 *WL* 3912934, at \*17 (C.D. Cal. Aug. 14, 2018)). Accordingly, the Allergan Plaintiffs' entire theory of liability depended on proving that Valeant took "substantial steps" toward the tender offer -- e.g. to sell Allergan securities, primarily in exchange for Valeant securities. Since the Williams Act claim would, of necessity, fail absent a tender offer, the Allergan Actions, *a fortiori*, clearly alleged, as well as arose out of, offers to sell Valeant's securities.

Valeant further explains that because it was "cash poor," it had no viable option to advance its tender offer scheme without offering its own securities (both in the tender offer and to Pershing), see Pl. Brief at 8 (citing SAC ¶¶ 67, 69, 143), and as such, the allegations that Valeant offered to exchange its own securities (and cash) for Allergan securities, clearly constituted an offer to sell Valeant securities.

In further support of its argument, Valeant compares and contrasts traditional tender offers with and against its own ill-fated scheme, explaining that "offers to sell securities" indisputably include "offers to exchange shares," thus rebuking the Insurers contrary efforts to argue that a "tender offer" is "traditionally" understood as an offer to pay a higher-than-market price for shares. The Insurers' assertion that a tender offer to purchase cannot, at the same time, also qualify as an offer to sell, fails, according to Valeant, because, even though all tender offers include an offer to purchase the target's securities, it does not preclude a tender offer that includes an offer to exchange securities, as was contemplated here. Accordingly, Valeant's tender offer qualified as both an offer to purchase Allergan securities, as well as an offer to sell

Valeant securities.[17]

### B.   Defendants' Cross-Motions and Positions.

Defendant AIG Canada, joined by other excess carriers, cross-moved for Judgment on the Pleadings with respect to Count V of Valeant's Complaint. See footnote 1, infra.

In their Cross-Motions, the carriers assert that Valeant's Motion must be denied and their's granted because the alleged misconduct described in the Allergan Actions neither arises out of, nor is it based upon or attributable to, the purchase, sale,

---

[17] This conclusion is also supported by the Financial Report Manual of the Securities and Exchange Commission which specifically acknowledges that a "sale" includes "offerings of common equity pursuant to an exchange offer," (See Pl. Reply at 14, and undermines each of the cases cited by Defendants, since none hold that an "exchange" offer does not qualify as a "sale." U.S. SEC. & Exch. Commission, Financial Reporting Manual, Topic 10, Sec. 10110.1-3, https://www.sec.gov/corpfin/cf-manual/topic-1.0#Topic10_10100; see also, Applied Digital Data Sys. Inc. v. Milgo Elec. Corp., 425 F. Supp. 1145, 1151 n.12 (S.D.N.Y.)(noting that while "'tender offers,'" [are] generally . . . offers to purchase a target company's shares for cash, there is no doubt that the provisions of the Williams Act are equally applicable to 'exchange offers,' in which the offeror seeks to exchange securities for the stock of the target company"), supplemented, 425 F. Supp. 1163 (S.D.N.Y. 1977); E.H.I. of Florida, Inc. v. Insurance Co. of N. America, 652 F.2d 310, 315 (3d Cir. 1981)(holding "sinking fund" transaction was not a tender offer, omitting any analysis of whether an exchange constitutes a sale); Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 54 (2d Cir. 1985)(defining traditional tender offer but omitting analysis of whether an offer to exchange stock constitutes a sale); Panter v. Marshall Field & Co., 486 F. Supp. 1168, 1188 (N.D. Ill. 1980)(noting existence of exchange offers but omitting analysis of whether an exchange constitutes a sale), aff'd, 646 F.2d 271 (7th Cir. 1981).

offer or solicitation of an offer to purchase or sell, any Valeant securities. As asserted by the Cross-Moving Defendants:

1.  The Allergan Plaintiffs did not purchase or sell any securities of Valeant.

2.  The Allergan Plaintiffs' claims center on insider trading and "front running" in Allergan stock, and contend that Valeant's future planned tender offer – which ultimately included an interest in a fractional share of Valeant was hidden from, and therefore unknown to them.

3.  The Allergan Plaintiffs never received any offer to purchase or sell Valeant securities and, in fact, the Class Period in the Allergan Actions ended before the putative tender offer was disclosed, and thus never received the tender offer, a central component of their causes of action.

4.  The Allergan Plaintiffs never asserted that the specific terms of Valeant's proposed tender offer violated U.S. securities laws, or injured them in any way, and as such, the tender offer terms were of no consequence or import to their causes of action.

AIG Canada argues that Valeant's quest to establish coverage is based on an improper mischaracterization of the Allergan Actions and constitutes a strained effort to "shoehorn"

them into the narrow definition of a "Securities Claim." Instead, they contend, the Allergan Actions complain of conduct that relates to the surreptitious manipulation of the value of Allergan stock, conduct not covered under the Valeant policies.

According to the carriers, the Allergan Actions were brought by former Allergan shareholders and debt-holders against Valeant for insider trading and front running in Allergan stock, who alleged that they sold their Allergan shares for less than they would have, had they known that Valeant was planning, but had not made public, a tender offer for Allergan stock. Those claims, assert the carriers, are not "Securities claims," and instead, contend that since their sale of Allergan stock occurred before learning of Valeant's manipulative plans, they did not, and could not, arise out of those plans.

The carriers next contend that because Valeant's tender offer was an offer to purchase or otherwise acquire the stock of the target entity, Allergan, it cannot constitute an offer to sell Valeant securities. And, notwithstanding the Allergan Plaintiffs' reference to the "tender offer" more than 150 times in their SAC, the carriers disavow any connection with the sale (or proposed sale) of Valeant stock, insisting instead that the phrase "tender offer" simply referred to background information, and did not represent the gravamen of Plaintiffs' claims.

In this regard, the carriers assert that the SAC actually supports their position. They point to the Preliminary Statement which details the conduct that gave rise to three securities law violations, but characterize these transgressions as involving Allergan stock, not Valeant stock, and note that none of the violations refer to Valeant securities.

They further point out that the Allergan Plaintiffs failed to allege that they:

(1) ever sold or purchased Valeant stock;

(2) were ever offered an opportunity to purchase a single share of Valeant stock; or

(3) knew of Valeant's planned tender offer, (which, of course, goes to the very heart of the Allergan Plaintiffs insider trading allegations).

Accordingly, both AIG and the excess carriers maintain that Valeant's offer to "sell" its shares in exchange for Allergan shares did not, and could not, serve as the basis of the Allergan Plaintiffs' claims, and therefore do not constitute "Securities Claims" as defined in the policies.

## DISPOSITION

Both Plaintiffs and Defendants have articulated well-reasoned oral and written arguments concerning whether the claims alleged by the Allergan Plaintiffs constitute "Securities

Claims" as defined under the Policies in issue. Based upon these comprehensive submissions of the parties, their cogent oral arguments, and my own analysis of the applicable cases and statutory authorities, I am persuaded that Valeant's undisclosed tender offer stems from "the purchase or sale or offer or solicitation of an offer to purchase or sell Valeant securities." Thus, while the Cross-Moving Defendants have forcefully argued that the Allergan Plaintiffs' claims arise from Valeant's purported conspiracy with Pershing and its having engaged in insider trading, I am firmly convinced that Valeant's attempted takeover of Allergan is inescapably intertwined with, is related to, and arises from, Valeant's undisclosed tender offer to exchange (or "sell") its stock for shares of Allergan. Accordingly, for the reasons that follow, my recommended disposition of these cross-motions for judgment on the pleadings is that the Allergan Plaintiffs' claims indeed constitute "Securities Claims" as defined by the policies, and thus are covered claims under the Policies in issue.

### A.   Legal Standard For Motion For Judgment on the Pleadings.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) may be granted if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law. DiCarlo v. St. Mary Hosp., 530 F.3d 255, 262-63 (3d Cir.

2008) (citing <u>Allah v. Brown</u>, 351 F. Supp. 2d 278, 280 (D.N.J. 2004)). The complaint's well-pleaded allegations will be accepted as true, and the complaint construed in the light most favorable to the nonmoving party, but unsupported conclusory statements will not be accepted. *Id.*

In ruling on a Rule 12(c) motion, documents outside the pleadings may be considered if "integral to or explicitly relied upon in the complaint." *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004), *as amended* (Mar. 3, 2004) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Matters of public record and materials subject to judicial notice, including opinions in related cases may also be considered without converting the motion to one for summary judgment. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993); *see also Caleb v. CRST, Inc.*, 43 F. App'x 513, 515 n.6 (3d Cir. 2002) (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999)). Here, notice has been taken of the pleadings in the Allergan Actions as well as the tentative and final opinions entered by Judge Carter in those actions in my assessment of the

nature and scope of those allegations.[18]

### B.    The Allergan Actions.

Resolution of the instant Motions requires me to interpret the language of the 2013-14 Policies and to determine whether the claims made in the Allergan Actions constitute "Securities Claims" as that term has evolved and is currently defined in the applicable policies.  Thus, an examination of the claims alleged in the Allergan Complaint is critical to such determination.

According to the SAC, the Allergan Plaintiffs are former Allergan shareholders who sold their shares in Allergan stock (not Valeant stock) between February and April 2014.  However, the reason the Allergan Plaintiffs alleged claims against Valeant, among others, is that Valeant and William Ackman, the CEO of Pershing, allegedly concocted a scheme through which Ackman agreed to acquire nearly 10% of Allergan's stock and vote those shares in favor of Valeant's forthcoming bid to takeover Allergan.

In exchange for participating in Valeant's scheme, the Allergan Plaintiffs allege that Pershing obtained a virtually risk-free trading opportunity to "front run" Valeant's bid and accumulate a multi-billion dollar stake in Allergan before

---

[18] Valeant, while refuting the allegations in the SAC and the conclusions drawn by Judge Carter in the Allergan Actions, nonetheless asserts that those allegations and conclusions are relevant in determining whether they constitute covered claims under the Policies.  Valeant's Moving Brief at 12-13 n.11.

Valeant's ultimate bid and tender offer became public. The basis of this opportunity was, of course, Pershing's advance knowledge of Valeant's as yet, publicly undisclosed intent to make a tender offer to exchange Allergan stock for its own stock and cash. Thus, the Allergan Plaintiffs allege that by sharing this undisclosed tender offer with Pershing, Valeant secured crucial voting support from Pershing's large block of Allergan shares – something Valeant believed necessary to implement its hostile takeover and overcome Allergan's expected defensive measures. As pled by the Allergan Plaintiffs, Valeant purportedly lacked sufficient liquidity to acquire the "toehold" stake needed to achieve a hostile takeover of Allergan. Instead, by providing Pershing inside information about its intended tender offer, in exchange for Pershing's future votes to support the takeover, the Allergan Plaintiffs claim that Valeant was able to acquire nearly 10% of Allergan's stock without investing all of its own capital, up-front.

In furtherance of this covert arrangement, on February 25, 2014, Pershing surreptitiously began buying up Allergan shares from investors, stopping just short of the 10% reporting trigger (mandated by antitrust and federal securities disclosure rules) that would have alerted investors to Pershing's stealth trading. By April 8, 2014, Pershing had purchased over 14 million Allergan shares, and by April 21, 2014, had amassed in excess of

28 million Allergan shares, or 9.7% of the company. After the close of trading on April 21, 2014, Valeant publicly disclosed its intention to acquire Allergan (including, of course, Pershing's 9.7% stake in the company). (*See* Carter Op. 13:25-14:1) Following this disclosure, Allergan's stock price jumped 22%.

There is no dispute that the Allergan Plaintiffs were all persons who sold Allergan common stock during the period between February 25, 2014 and April 21, 2014, and that the Class Period closed on April 21, 2014. The next day, on April 22, 2014, Valeant publicly announced its intent to acquire Allergan, offering to purchase Allergan common stock for a partial interest in a share of Valeant stock, plus $48.30 in cash. (*See* Carter Op. 13:25-14:1) After Valeant's offer was rejected – (along with various subsequent offers), – Valeant formally commenced the launch of the tender offer by filing a Form S-4 registration statement.[19] (*See* SAC at ¶166)

It is understood and acknowledged that no shares of Valeant were ever purchased or sold by the Allergan Plaintiffs. I am satisfied, nonetheless, that this is not dispositive of whether

---

[19] Not surprisingly, Valeant's tender offer resulted in a bidding war which Valeant ultimately lost. However, the Allergan Plaintiffs claim that despite having lost the bidding war for Allergan, Valeant still shared in Pershing's profits from the stock price jump and the ultimate sale to the competing (highest) bidder.

Valeant's offers, both prior to and during the tender offer process – which included offers to exchange Allergan stock for an interest in Valeant stock and cash – constitute "offer[s] to purchase or sell" Valeant securities. The issue is complicated and warrants a deeper, more sophisticated analysis.

The Allergan Plaintiffs brought causes of action against Valeant: (1) alleging violations of the Exchange Act and Rule 14e-3 thereunder; and (2) alleging violations of Section 20A of the Exchange Act. The crux of these claims was that Valeant unlawfully disclosed material, non-public information that it intended to make a tender offer for Allergan shares to Pershing, and that it was certainly reasonably foreseeable that Pershing, armed with that inside information, would illegally make trades and profit thereby. The ensuing injury and damages were suffered when the Allergan Plaintiffs sold their shares for a lower price than they otherwise would have obtained.

The Allergan SAC alleged that Valeant's tender offer, made after Pershing and Valeant were unjustly enriched by purchasing shares of Allergan at a pre-disclosure, bargain price, included an offer to exchange Allergan stock for Valeant stock and cash:

> The next day, on April 22, 2014, Valeant delivered to Allergan a formal, unsolicited proposal offering to acquire Allergan for $48.30 in cash and .83 of Valeant stock per Allergan share – representing a price per share of approximately $160 per share and a value of over $46 billion based on Valeant's

> then-stock price. In the April 22, 2014
> "bear hug" proposal, Pearson described the
> purported benefits of Valeant's offer,
> specifically touting that Pershing, as
> "Allergan's largest shareholder," was
> "strongly in favor of the combination."
> Pearson likewise explained that the
> Defendants knew the transaction would be
> hostile "given that Allergan has not been
> receptive to our overtures for over eighteen
> months and has made it clear both privately
> and publicly that it is not interested in a
> deal" with Valeant.

SAC at ¶126, attached to Pastor Cert. as Exh. N (emphasis

added).

> On May 28, 2014, Valeant increased the
> pressure by announcing a revised offer of
> $58.30 in cash and *0.83 shares of Valeant*
> *stock per Allergan share*, a total value of
> approximately $153.67 per share based on
> Valeant's then-stock price. Two days later,
> on May 30, Valeant made a second revised
> offer of $72.00 in cash and 0.83 shares of
> Valeant stock per Allergan share, valued at
> approximately $181 per Allergan share (the
> "Second Revised Proposal").

SAC at ¶158, attached to Pastor Cert. as Exh. N (emphasis

added). *See also*, Complaint in *Basile v. Valeant Pharmaceuticals*

*International, Inc.*, Central District of California, at ¶65,

attached to Pastor Cert. as Exh. O.

Thus, the claims alleged by the Allergan plaintiffs include

and incorporate the exchange of Allergan and Valeant stock as a

component part of the illegal scheme.

-35-

C.    "Securities Claims" Under The 2013-14 Policies.

Valeant purchased $150 million in insurance coverage as part of the Policies. As noted previously, the Policies define a "Securities Claim," in relevant part, as any Claim:

> (1)  [A]lleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:
> (a)  brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer to purchase or sell any securities of an Organization[20]; or
> (b)  brought by a security holder or purchaser or seller of securities of an Organization with respect to such security holder's, purchaser's or seller's interest in securities of such Organization…

See Endorsement 21 of the Policies attached to Pastor Cert. as Exh. A.

D.    Discussion

As discussed above, the dispute between Valeant and the 2013-2014 Tower Defendants is whether the insider trading claims pled by the Allergan Plaintiffs stemming from Valeant's unlawful, clandestine disclosure of its proposed tender offer for Allergan stock, constitutes a "Securities claim" as defined under the Policies.

---

[20] The Policies defines the term "Organization" to mean "the Named Entity," which is Valeant.

-36-

In coverage actions, terms of insurance policies are given their plain meaning, and are interpreted in accordance with the common understanding of legal terms. *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006).

Accordingly, to properly analyze the issue in this motion, it is necessary to explore what a tender offer actually entails. The Second Circuit has characterized a tender offer as follows:

> [t]he typical tender offer, as described in the Congressional debates, hearings and reports on the Williams Act, consisted of a general, publicized bid by an individual or group to buy shares of a publicly-owned company, the shares of which were traded on a national securities exchange, at a price substantially above the current market price. *See* House Report, *supra,* at 2; Senate Report, *supra,* at 2; 113 Cong.Rec. at 855 (Jan. 18, 1967) (Senator Williams); *Takeover Bids: Hearings on H.R. 14475, S. 510 before the Subcommittee on Commerce and Financing of the House Committee on Interstate and Foreign Commerce,* 90th Cong., 2d Sess., 10 (1968) (House Hearings) (Manuel Cohen, Chairman, S.E.C.); *id.* at 44 (Donald Calvin, Vice-President, New York Stock Exchange); *Full Disclosure of Corporate Equity Ownership in Corporate Takeover Bids: Hearings on S. 510 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency,* 90th Cong., 1st Sess. at 2 (1967) (Senate Hearings) (Senator Williams); *id.* at 17 (Manuel Cohen); *id.* at 42 (Senator Kuchel). The offer was usually accompanied by newspaper and other publicity, a time limit for tender of shares in response to it, and a provision fixing a quantity limit on the total number of shares of the target company that would be purchased.

*Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 54–55 (2d Cir. 1985).

As noted by Judge Carter, when the SEC enacted Rule 14e-3, it:

> sought to address the practice of "warehousing" (the practice of the tender offeror intentionally leaking information to institutional investors to allow those other entities to make early trades before other investors heard about the tender offer), because such a practice is unfair to investors who are trading at an informational disadvantage. *Id.*; Tender Offers, 44 Fed. Reg. 9956, 9976–77 (Feb. 15, 1979) ("Proposed Rule 14e-2"); *see also Chiarella v. United States,* 445 U.S. 222, 234 (1980) (noting that the SEC promulgated Rule 14e-3 to prevent warehousing). The SEC explained that insider trading in this context is unfair to investors because **\*19** [s]ecurity holders who purchase from or sell to [persons with material nonpublic information relating to a tender offer] are effectively denied the benefits of disclosure and the substantive protections of the Williams Act. If furnished with the information, these security holders would be able to make an informed investment decision, which could involve deferring the purchase or sale of the securities until the material information had been disseminated or until the tender offer had been commenced or terminated.

*In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 814CV02004DOCKESX, 2018 WL 3912934, at \*18–19 (C.D. Cal. Aug. 14, 2018)(citing SEC Adopting Release at 60,412).

1.   **The Policies Cover Valeant as an "Organization".**

Do the Policies provide coverage to Valeant for the claims alleged against it by the Allergan Plaintiffs?   Pursuant to Paragraph 1(C) of the Policies, the Insurers agreed to pay the "Loss of any Organization . . . arising from any Securities Claims . . . made against such Organization. . . ." *See* Primary Policy attached to Pastor Cert. at Exh. A, at 1(C). "Organization" is defined to include Valeant and its subsidiaries. Pastor Cert., Exh. A at 23.   Thus, the Policies provide coverage to Valeant for "Securities Claims."

2.   **The SAC Alleges "A Violation of Law."**

The Policies define a "Securities Claim" as one that alleges "a violation of any law, rule or regulation, whether statutory or common law . . . ."

Thus, the Policies broadly define a Securities Claim as one that can include both statutory and common law claims.   Although broadly defined, as pointed out by the Cross-Moving Defendants, merely referencing "securities" will not suffice to render a claim within the risk covered in a D&O policy.   Cross-Moving Defendants' Brief at 23.   As noted by the Delaware Supreme Court:

> [i]n the parlance of securities law
> statutes, securities laws typically apply to
> "the purchase or sale, or offer for sale" of
> securities. . . . Second, securities laws
> typically involve not only statutes, but
> also rules and regulations. For example,
> under the federal Securities Act, the
> Commission has the authority to make, amend,
> and rescind "rules and regulations" as
> necessary, . . . where "rules and
> regulations" are defined together as "all
> rules and regulations adopted by the
> Commission." . . . An example of a "rule"
> created under the 1934 Act is Rule 10b-5,
> which governs fraud "in connection with the
> purchase or sale of any security." . . .
> **\*574** . . . Thus, we start with a basic
> understanding of the words used in the
> policy that the definition of a Securities
> Claim is aimed at a particular area of the
> law, securities law, and not of general
> application to other areas of the law.

*In re Verizon Insurance Coverage Appeals*, 222 *A.3d* 566, 573-74
(Del. 2019). The Delaware Supreme Court in *Verizon Insurance
Coverage* reversed a finding of coverage, noting that the common
law breach of fiduciary duty claims that were the subject of
that matter were not within the scope of coverage for violations
of securities regulations contemplated by the insurance
policies. *Id.* at 575.

A number of courts have likewise denied coverage in cases
where the insureds sought coverage for common law claims. For
example, a New York court concluded that claims of breach of
fiduciary duty stemming from the issuance of preferred stock to
a controlling shareholder was not a covered "Securities Claim"

-40-

as defined by the policy. *XL Specialty Insurance Co. v. Loral Space & Communication, Inc.*, 918 *N.Y.S.2d* 57, 64 (1st Dept. 2011); *see also, Kollman v. National Union Fire Insurance Company of Pittsburgh, Pa*, Civ. No. 04-3106-PA, 2007 *WL* 2344825, at *3 (D. Or. Aug. 13, 2007), aff'd, 542 Fed. Appx. 649 (9th Cir. 2013) (A District Court in the District of Oregon concluded that claims of breach of contract and civil conspiracy stemming from a corporate restructuring did not constitute covered "Securities Claims" under the policy).

Notably, the definitions of Securities Claims in those policies are distinguishable since the Policies here expressly permit "common law claims." *See, e.g., Kollman,* 2007 *WL* 2344825, at *2. Moreover, statutory, rather than "common law claims" are at issue here.[21] The Allergan Plaintiffs alleged a violation of Sections 14e-3 (also referred to as "The Williams Act") and 20A of the Securities and Exchange Act of 1934. *See*

---

[21] Likewise, two cases relied upon by the Cross-Moving Defendants, *American & Foreign Insurance Co. v. Church School in Diocese of Virginia,* 645 *F. Supp.* 628, 634 (E.D. Va. 1986)(denying coverage for claims arising from a student's claims of sexual abuse and emotional distress under a school's general liability policy) and *Adamo v. State Farm Lloyds Co.,* 853 *S.W.2d* 673, 676-77 (Tex. App. 1993)(denying coverage for claims of legal malpractice under defendant's homeowner's policy on the basis that the attorney's friendship with his client gave rise to coverage based upon a fiduciary relationship), are similarly inapposite. Both *American & Foreign Insurance* and *Adamo* involve the denial of claims for coverage or a duty to defend under policies on the basis of attenuated claims. For the reasons set forth herein, I do not find Valeant's claims for coverage to be similarly attenuated.

SAC at ¶11. Section 14e prohibits insider trading in connection with tender offers.

> It has been noted that s 14(e) in effect applies Rule 10b-5 to a tender offeror and parties opposing a tender offer. *Electronic Specialty Co. v. International Controls Corp.*, 409 *F.2d* 937, 940-41 (2d Cir. 1969). Indeed, the language of the two provisions is identical in all operative respects except that Rule 10b-5 is applicable "in connection with the purchase or sale of any security" while s 14(e) is applicable "in connection with any tender offer."

*Applied Digital*, 425 F. Supp. at 1153.

Section 20A provides a private right of action against one who has engaged in insider trading in violation of Title 15 which governs commerce and trade. These claims allege violations of rules and regulations governing the trading of securities, precisely the type of violations contemplated under the plain meaning of the definition of "Securities Claims" in the Policies.

While it is undeniably true that Valeant's anticipated tender offer was hidden from, and unknown to the Allergan Plaintiffs when they sold their shares, this insider trading is the very essence of a Williams' Act claim. Indeed, if the Allergan Plaintiffs knew about the Valeant tender offer, they would have no claim. Nonetheless, in my view Valeant's surreptitious scheme unquestionably included a sale of Valeant stock which allegedly violated strictures for the trading of

securities, *see* SAC at ¶¶126 & 158, attached to Pastor Cert. at Exh. N, and otherwise meets the definitional requirements of a "Securities Claim."

Accordingly, the allegations in the Allergan SAC, if proven, would unquestionably constitute a violation of law(s).

### 3. The Allergan Plaintiffs' Claims Were Brought By "Any Person or Entity."

Under the Policies, covered claims may be brought by "any person or entity" alleging claims arising from the offer to purchase or sell securities of the Organization.  The party bringing the claim need not be an owner, purchaser or seller of Valeant stock.  Thus, while it is true that the claims were brought by owners of *Allergan* stock relating to the depressed price of *Allergan* stock, this does not disqualify the claims. The alleged scheme unquestionably included an offer to sell Valeant stock, *see* SAC at ¶¶126 & 158, attached to Pastor Cert. at Exh. N.  The person or entity entitled to bring a claim is broadly defined, authorizing "any" person or entity to bring such a claim.  The Allergan Plaintiffs certainly satisfy this criteria.

4.  **The Allergan Plaintiffs' Claims "Allege, Arose Out Of, Were Based Upon Or Attributable To" The Sale of Securities.**

The Policies provide that covered claims must allege, arise out of, be based upon or attributable to, the offer to purchase or sell any securities of the Organization.  The satisfaction of any one of these four predicates is sufficient.[22]

The term "allege" means "to say that someone has done something illegal or wrong without giving proof." Defendants' Reply Brief at 11 (citing definition of "alleging" from the Cambridge Advanced Learner's Dictionary & Thesaurus © Cambridge University Press).  The definition proffered by Valeant succinctly defines "to allege" to be the equivalent of "to assert as true."  Valeant's Reply Brief at 21.

Courts have likewise given a broad and liberal interpretation to the phrase "arising out of."  *See Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 444 (3d Cir. 2003). Indeed, as the New Jersey Supreme Court has instructed:

---

[22] At oral argument, it appeared that the Cross-Moving Defendants may have been asserting the position that in order to establish a "Securities Claim," each of these four predicates must be satisfied and there must be a substantial nexus between the subject conduct and the policy language. Tr. at 86:24-87:20; 95:6-96:6.  Contrariwise, Valeant's position at oral argument was that it need only establish one of these four predicates and that establishing a "substantial nexus" or "proximate cause" was not essential. Tr. at 60:5-63:22.

> [t]he critical phrase "arising out of," which frequently appears in insurance policies, has been interpreted expansively by New Jersey courts in insurance coverage litigation. "The phrase 'arising out of' has been defined broadly in other insurance coverage decisions to mean conduct 'originating from,' 'growing out of' or having a 'substantial nexus' with the activity for which coverage is provided."

*American Motorists Ins. Co. v. L-C-A Sales Co.*, 155 *N.J.* 29, 35, 713 *A.2d* 1007, 1010 (1998)(internal citations omitted); *see also, Cruz-Mendez v. ISU/Insurance Services of San Francisco*, 156 *N.J.* 556, 576 (1997) (citing *Westchester Fire Ins. Co. v. Continental Ins. Cos.,* 126 *N.J. Super.* 29, 38 (App. Div. 1973), *aff'd.* 65 *N.J.* 152 (1974) ("arising out of" requires only a "substantial nexus" and not proximate cause.)) "'Arising out of' must be interpreted in a broad and comprehensive sense . . . ." *Westchester Fire Ins. Co.*, 126 *N.J. Super.* at 38. Thus, only a "substantial nexus" is required between the alleged harm and the activity for which coverage is provided in order for a coverage obligation to arise. *Id.*

As pointed out by Valeant, the phrase "arising out of" has also been broadly construed to mean "incident to," or "flowing" from. *See, e.g., Markel Int'l Ins. Co. v. Centex Homes, LLC*, No. CIV. 05-3540 (GEB), 2006 *WL* 278920, at *5 (D.N.J. Feb. 2, 2006); *see also, County of Hudson v. Selective Ins. Co.,* 332 *N.J. Super.* 107, 114 (App. Div. 2000) (noting the phrase "arising out of"

has been defined broadly to mean conduct "originating from," "growing out of" or having a "substantial nexus" with the activity for which coverage is provided); 7 COUCH ON INS. § 101:52 (principles of construction — "Arising out of"; "resulting from"); *but see*, *Sealed Air Corp. v. Royal Indem. Co.*, 404 *N.J. Super.* 363, 380 (App. Div. 2008)(interpreting an exclusion for claims "arising out of" pollution claims narrowly); *Foodtown, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* Civ. Action No. 05-3627, 2008 *WL* 3887617, at *5 (D.N.J. Aug. 20, 2008), *aff'd*, 412 *F. App'x* 502 (3d Cir. 2011) (rejecting insurer's attempt to broaden the scope of an exclusion "arising out of" contract claims beyond its plain and ordinary meaning).

In *Sealed Air*, the New Jersey Appellate Division explained the critical difference in interpreting insurance "coverage" provisions, as contrasted against those carving out "exclusions":

> '[w]e recognize those well-settled principles governing the interpretation of contracts of insurance that mandate broad reading of coverage provisions, narrow reading of exclusionary provisions, resolution of ambiguities in the insured's favor, and construction consistent with the insured's reasonable expectations.' . . . However, when the provisions of the text, read literally, would largely nullify the protections afforded by the policy, we restrict their meaning so as to enable fair fulfillment of the stated policy objective.

*Sealed Air*, 404 *N.J. Super.* at 375-76 (internal citations and quotations omitted.  Thus, "[i]nsurance policy exclusions must be narrowly construed."  *Foodtown, Inc.*, 2008 *WL* 3887617, at *2 (internal citations and quotations omitted).

Nonethelss, in *American Motorists*, the New Jersey Supreme Court rebuffed any notion that the policy exclusion for claims of bodily injury to an employee "arising out of and in the course of employment" should be read narrowly to exclude plaintiff's age discrimination claim because his bodily injury arose out of his termination, rather than his employment, *American Motorists*, 155 N.J. at 35, and concluded that the wrongful termination claim "unquestionably arose out of and in the course of his employment, as did the essential factual allegations on which the cause of action was predicated."  *Id.* at 42.

In contrast, the District Court in *Markel International* concluded that injuries from a car accident with an off-duty employee of a subcontractor/additional insured while that employee was on his way home did not arise "out of work or operations performed by the main policyholder."  *Markel Int'l*, 2006 *WL* 278920 at *5.  The passenger asserted that the main policyholder's negligent failure to trim trees on its site adjacent to the roadway where the accident occurred impaired the

employee's line of sight and contributed to the accident. *Id.* at *5-6. The District Court noted that the employee, whose work consisted of constructing masonry posts at the construction site, was not performing any of his "work" responsibilities at the time of the accident, and further that there was no connection between the policy holder's alleged failure to maintain the trees on his site and the employee's work. *Id.* at 6. Because the District Court found the employee's accident did not have a substantial nexus with, nor arise out of the operations of the main policyholder, it concluded that there was no coverage, *Id.,* stating: "[w]hether the requisite connection or degree of relationship exists depends upon the circumstances of the particular case...." *Id.* at 5; *but see*, *County of Hudson, 332 N.J. Super.* at 117 (concluding that visits to the worksite to provide subcontractors with information was sufficiently connected to the contractor's work to constitute a "substantial nexus" requiring the insurer to cover the loss).

The Cross-Moving Defendants urge that the logic of *Markel International* supports a finding of no coverage in this case, because the term "arising out of" requires "conduct originating from," "growing out of," or having a "substantial nexus with" the activity for which coverage is provided, which was absent in

this case.   Defendants Brief filed June 30, 2020 at 30(citing
*Markel Int'l,* 2006 WL 278920 at \*5).

They likewise rely on *Office Depot, Inc. v. National Union
Fire Insurance Company of Pittsburgh, Pa.,* 734 *F. Supp. 2d* 1304,
1323 (S.D. Fla. 2010), aff'd sub nom., 453 *Fed. Appx.* 871 (11th
Cir. 2011), (Cross-Moving Defendants' Moving Brief at 31), which
rejected   coverage   for   amounts   expended   in   pre-suit
investigations, based upon the temporal or sequential aspect of
events which precluded coverage for costs incurred before any
claims were filed.   Nonetheless, the *Office Depot* court did
embrace a broad reading of the phrase "arising out of":

> [t]he phrase "arising out of" or "arising
> from," when used in an insurance contract,
> is broad and means "originating from,"
> "having its origin in," "growing out of,"
> "flowing from," "incident to" or "having a
> connection with." . . . The term "requires
> more than mere coincidence," but less than
> proximate cause.

*Id.* (internal citations omitted); *see also*, *Bond Safeguard Ins.
Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 628 *F.
App'x* 648, 654-55 (11th Cir. 2015) (broadly interpreting
"arising out of").

Inasmuch as the phrase "arising out of" has often been
interpreted so broadly, most courts typically decline to
undertake an independent analysis of the terms "based upon" and
"attributable to" when analyzing a grant or exclusion of

coverage. *See e.g.*, *Nat'l Title Agency, LLC v. United Nat'l Ins. Co.*, Case No. 2:15-cv-160-JNP, 2016 *WL* 1092485, at *5 (D. Utah Mar. 21, 2016); *Bond Safeguard Ins. Co.*, 628 F. App'x at 654.

Still, the Cross-Moving Defendants assert that the interpretation of "arising out of, based upon or attributable to" requires a substantial nexus between the conduct and the policy language.  Cross-Moving Defendants' Moving Brief at 35; *but see*, *Bond Safeguard Ins. Co.*, 628 *F. App'x* at 654–55 (explaining it requires more than coincidence, but not proximate cause); *Office Depot*, 734 *F. Supp. 2d* at 1323 (noting it "requires more than mere coincidence, but less than proximate cause").

It is also true that policy language ought not be construed so broadly that the exception is permitted to swallow the rule. *See, e.g.*, *Auto-Owners Insurance Co. v. Stevens & Ricci Inc.*, 835 *F.3d* 388, 405 n.21 (3d Cir. 2016)(noting that under both Pennsylvania and Arizona law the reasonable expectations of the parties may be considered when the contract language is not readily understandable but cannot defeat unambiguous contract language as that would allow the exception to swallow the rule); *see also*, *GTE Corp. v. Allendale Mutual Insurance Co.*, 372 F.3d 598, 614 (3d Cir. 2004), (predictably finding that costs incurred in correcting design defects of anticipated Y2K

computer failures were not covered claims, since "exclusion[s] cannot be construed so broadly that the rule (the exclusion) is swallowed by the exception.") (internal quotations omitted). Nor can policy language be interpreted in such a way as to render other clauses of the policy meaningless. *See Verizon Insurance Coverage Appeals*, 222 A.3d 566, 580 (Del. 2019)(reversing finding of coverage for breach of fiduciary duty claims because it rendered the definition of "Securities Claim" (that a claim be for purchase and sale of securities), meaningless).

Similarly, in *Verizon Insurance Coverage Appeals*, the court rejected coverage under the Securities Claim provision and explained:

> [t]he trustee's complaint alleged fiduciary duty violations, unlawful dividends under Delaware law, statutory fraudulent transfer claims, and unjust enrichment and alter ego common law claims. . . . Because none of these claims implicates a "regulation, rule or statute" specifically directed towards securities law, none of the claims fall under the "Securities Claim" definition of the policy

*Id.* at 576; *see also, XL Specialty Insurance Co. v. Loral Space & Communication, Inc.*, 918 N.Y.S.2d 57, 64 (1st Dept. 2011)(same).

In my view, those cases are distinguishable from, and have little persuasive force, under the facts and circumstances of

-51-

this case.   Here, the SAC alleges that the Allergan Plaintiffs
suffered damage because they sold their Allergan shares to
Pershing for a lower price than they would have received, had
they known what Pershing knew - that Valeant intended to make a
tender offer to exchange shares of Allergan stock for Valeant
stock and cash.   The Allergan Plaintiffs emphasized the fact
that following Valeant's announced tender offer, (shortly after
they had sold their shares to Pershing) the price for Allergan
shares rose sharply.   *See* Allergan SAC at ¶130.   While these
allegations certainly might be characterized as incident to,
flowing from, or originating from Valeant's tender offer to
exchange shares of its stock and cash for Allergan stock, the
Cross-Moving Defendants urge to the contrary and contend: (1)
that the Allergan SAC does not arise out of the purchase or sale
of Valeant securities; and (2) alternatively, since Valeant
represented to Judge Carter that it was only "considering"
making a tender offer when first meeting with Pershing, it
should be estopped from relying on such tender offer as the
basis to establish coverage.   *See* Defendant AIG's Moving Brief
at 32 n.18.

I  respectfully  disagree.   The Policy requirement that
claims need only arise out of, be based upon, or be attributable
to the purchase or sale of Valeant securities is not, in my
view, so narrowly drawn.   Instead, it is broadly written to

-52-

provide coverage for just such foreseeable losses. Moreover, even if Valeant did contest the Allergan Plaintiffs' claims that their losses arose from Valeant's tender offer, it is of no moment since the Policies' definition of "Securities Claims," requires only that "the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of [Valeant], be alleged." *See,* Policy Endorsement 21 (noting Securities Claim includes claims which "allege, arise out of, are based upon *or* attributable to"). While the offer to purchase or sell Valeant securities may not be the singular focus of the SAC (which obviously includes the sale of Allergan stock for an artificially depressed price), it does *allege* that this deflated price arose from, was related to, or was caused by Valeant's and Pershing's improper failure to disclose Valeant's anticipated tender offer.

Moreover, I reach the same conclusion when interpreting and analyzing whether the Allergan plaintiffs' claims "arise from" Valeant's anticipated and planned tender offer and reject Defendants' contention, underline{supra}, that *Markel International* compels the opposite conclusion. Defendants Brief filed June 30, 2020 at 30(citing *Markel Int'l,* 2006 *WL* 278920 at *5). Instead, I am satisfied that the allegations do involve "conduct originating from," "growing out of," or having a "substantial nexus with" a covered activity.

The Cross-Moving Defendants also assert that the Allergan plaintiffs' insider trading claims did not grow out of Valeant's decision to use its own stock to fund the tender offer, but instead suggest that Valeant's use of its own securities to purchase the Allergan stock is "superfluous" to the insider trading claims. Cross-Moving Defendants' Moving Brief at 31. To the contrary, the Allergan plaintiffs' allegations relate directly to Valeant's failure to disclose its intent to make a tender offer to exchange Allergan stock for .83 of a share of Valeant stock plus cash, and this exchange inherently includes a sale of Valeant stock. Thus, while the harm alleged by the Allergan plaintiffs is the depressed price of the *Allergan* stock resulting from Valeant's failure to disclose its proposed tender offer, the offer to sell/exchange Valeant stock is inextricably intertwined with the offer to purchase Allergan stock, and as such in my assessment, unquestionably grows out of, and has a substantial nexus with, a sale of Valeant securities, which is

the precise activity covered under Endorsement 21.[23]

During oral argument, the Cross-Moving Defendants also asserted that the Allergan plaintiffs' claims did not qualify as a covered "Securities Claim" because the harm alleged by the Allergan plaintiffs did not involve a diminution of value of *Valeant* stock or the under-valued sale of *Valeant* stock and, that the involvement of Valeant stock in the proposed tender offer was "merely incidental." Defendant AIG Canada's Reply Brief at 34, 37. Once again, I respectfully disagree and find that the involvement of Valeant stock was significantly greater than merely incidental. While the proposed, but undisclosed tender offer was directed to owners of Allergan stock, it was, nonetheless, an offer to exchange Allergan stock for *Valeant* stock plus cash, thus falling squarely within the Policies' definition of Securities Claims. Moreover, the Policy definition does not limit coverage to harm resulting from the

---

[23] As noted by Valeant, the tender offer for the exchange of .83 of a share of Valeant stock plus cash for each share of Allergan stock was not the only transactions involving its stock (Valeant Brief dated 8/14/20 at 19 n.6). There were other purchases of Valeant stock as well. For example, Valeant had the ability to compel Pershing to purchase $400 million of Valeant shares and, if the tender offer was consummated, it could compel Pershing to accept Valeant stock in exchange for its shares of Allergan. Carter Op. at 12. Although Defendants downplay these proposed purchases of Valeant stock and give them short shrift, (see Defendants' Brief dated 6/30/2020 at 11 & 14), these offers to purchase Valeant stock actually buttress Valeant's claim for coverage.

diminution of value to *Valeant* securities. Instead, the Policies define a "Securities Claim" as one:

> (1) [A]lleging a violation of any law, rule or regulation, . . . (including . . . an offer to purchase or sell securities), which is:
>
> (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer to purchase or sell any securities of an Organization;

. . .

*See* Endorsement 21 of the Policies attached to Pastor Cert. as Exh. A.

While the Cross-Moving Defendants assert that Valeant's tender offer "could" simply have been a purchase of Allergan stock for cash, (which would have eliminated the offer or sale of Valeant stock altogether), one cannot dispute that the actual tender offer did include the sale or exchange of Valeant stock.

Moreover, had the insurers intended to limit the coverage offered to damage caused to the *insured's stock* with respect to an offer to buy or sell such stock, they certainly knew how to tailor the definition of covered "Securities Claims" to do so. Instead of incorporating the expansive definition of "Securities Claims" used in the Policies, they easily could have used more circumscribed language when defining "Securities Claims." For

example, in the case of *Alstrin v. St. Paul Mercury Insurance Company*, a "Securities Claim" was defined as:

> a Claim made against the insured that alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934 ... which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company.

*Alstrin v. St. Paul Mercury Insurance Company*, 179 *F. Supp. 2d* 376, 396 (D. Del. 2002). This more narrowly drawn definition required that the alleged Wrongful Act have been committed in connection with the sale or offer to sell securities of the insured to the claimant. *See Id.* Had that language been used in these Policies, the coverage question might have been a closer call. Nevertheless, I am satisfied that the complaints alleged in Allergan's SAC meet each of the four predicates required by the Policies.

I likewise reject the contentions of the Cross-Moving Defendants that no substantial nexus exists between the coverage for Securities Claims in the Policies and the undisclosed tender offer. *See*, Cross-Moving Defendants' Moving Brief at 35. Nor do I perceive any valid concern that this conclusion constitutes a construction so broad that the exception will

"swallow the rule." *See, e.g.*, *Auto-Owners Insurance Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 405 n.21 (3d Cir. 2016).[24]

While it is true that Valeant's anticipated tender offer was hidden from and unknown to the Allergan Plaintiffs, (an acknowledged Williams' Act claim), this does not alter the fact that Valeant's alleged surreptitious scheme unquestionably included a sale or exchange of Valeant stock. See SAC at ¶¶126 & 158, attached to Pastor Cert. at Exh. N.

As such, I am entirely satisfied that this allegation falls squarely within the scope of the Policies' definition of a "Securities Claim."

5. **The Allergan Plaintiffs' Claims Arise From "The Purchase or Sale or Offer to Purchase or Sell" Securities of the Organization.**

The Policies provide that covered claims also include those alleging, or arising out of "the purchase or sale or offer to purchase or sell" securities of the Organization.

---

[24] Similarly, Defendants' reliance on *Impac Mortgage Holdings, Inc. v. Houston Casualty Co.*, is also misplaced. In that case, the District of Central California rejected plaintiffs' attempt to extend its D&O coverage for Securities Claims to allegations related to the policyholder's professional services in issuing and selling mortgage-backed securities, holding that the D&O coverage was limited to claims relating to the policyholder's sale of its own stock as opposed to the policyholder's sale of shares of any stock to which it had a connection. As discussed above, the instant matter involved Valeant's offer to sell shares of its own stock. Thus, *Impac Mortgage* is inapposite. No. SACV 11-1845-JST, 2013 WL 4045362, at *8 (C.D. Cal. Feb. 26, 2013), aff'd 634 F. App'x 614 (9th Cir. 2016).

As discussed *infra*, under the broad language of the Policies' definition, covered claims are not limited to the direct purchase or sale of securities.  It suffices if the claim alleges, arises out of, is based upon, or is attributable to, such purchase or sale.  The more complex question, of course, is whether Valeant's tender offer to purchase Allergan stock was, in fact, "the purchase or sale or offer to purchase or sell" Valeant stock, thereby triggering coverage under the Policies.

What constitutes a "sale" of securities is not limited to traditional sales of securities for cash but, importantly, also encompasses transactions pursuant to which securities are exchanged for other securities.  The Securities Exchange Act of 1934, 15 U.S.C.A. § 78c(a)(14) provides in pertinent part that with respect to securities:

> [t]he terms "sale" and "sell" each include any contract to sell or otherwise dispose of. For security futures products, such term includes any contract, agreement, or transaction for future delivery. For security-based swaps, such terms include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require. (emphasis added).

Our jurisprudence has long held a broad view of what constitutes the "sale" of securities:

> the Securities Act of 1933, [was] passed only one year before the Securities Exchange

> Act and authoritatively used as a source for
> definition of statutory terms common to both
> Acts. The Securities Exchange Act of 1934
> did not explicitly define "purchase or
> sale," but there is "no reason to believe
> that Congress intended, one year after the
> passage of the Securities Act, to dilute the
> concept of sale in the Securities Exchange
> Act." *Lawrence v. Securities Exchange Comm.*,
> 398 F.2d 276, 280 (1st Cir.1968). ***In the
> 1933 Act Congress explicitly provided that
> "sale" includes any "disposition of ... an
> interest in a security for value,"*** 15 U.S.C.
> § 77b(3), . . . .

*See Northland Capital Corp. v. Silver*, 735 *F.2d* 1421, 1433 (D.C.

Cir. 1984) (internal footnote omitted)(emphasis added); *see also*

*Lewis v. Chrysler Corp.*, No. CIV. A. 90-7963, 1991 *WL* 40348, at

*2 (E.D. Pa. Mar. 18, 1991), aff'd, 949 F.2d 644 (3d Cir. 1991)

(noting that the transfer of funds may constitute the purchase

of a security); *Southridge Partners, L.P. v. Akers*, No. A-1054-

14T3, 2016 *WL* 958092, at *4 (N.J. Super. Ct. App. Div. Mar. 15,

2016) (noting the Securities and Exchange Act of 1934 defines a

"sale" to mean "any contract to sell or otherwise dispose of")

(emphasis added).

The SEC's Financial Reporting Manual likewise notes that a

first sale "is not limited to a company's initial primary

offering of common equity securities for cash. It can also

include registered offerings of common equity *pursuant to an*

*exchange offer* . . . ." *See* U.S. SEC. & Exch. Commission,

Financial Reporting Manual, Topic 10, Sec. 10110.1-3,

https://www.sec.gov/corpfin/cf-manual/topic-1.0#Topic10_10100.

(emphasis added); *see also*, *Ruud v. Friendshuh*, Civ. Act. No. 14-1735, 2015 *WL* 868039, at *4 (D. Minn. Feb. 27, 2015)(noting an exchange of annuities involves two transactions and a court must consider both).

Cases cited by the Cross-Moving Defendants describing the essential nature of a tender offer, are not to the contrary. One such case notes that a tender offer is generally a "public invitation to a corporation's shareholders to purchase their stock for a specified consideration," *E.H.I. of Fla., Inc. v. Ins. Co. of N. Am.*, 652 *F.2d* 310, 315 (3d Cir. 1981); *see also Wellman v. Dickinson*, 475 *F. Supp.* 783, 823 (S.D.N.Y. 1979). Such an offer to purchase shares, if offered solely in exchange for cash, would involve only a sale of the tendered shares. However, the cases also acknowledge that tender offers can also take the form of "exchange" offers which, by definition, involve the sale of stocks from two entities. See e.g. *Panter v. Marshall Field & Co.*, 486 *F. Supp.* 1168, 1190 (N.D. Ill. 1980), aff'd, 646 *F.2d* 271 (7th Cir. 1981); *Applied Digital Data Sys. Inc. v. Milgo Elec. Corp.*, 425 *F. Supp.* at 1151 n.12(noting exchange offers are offers to exchange securities for the stock of the target company).

Here, the subject transaction was an unconsummated offer to exchange Allergan stock for an interest in Valeant stock plus

cash.   (SAC ¶¶ 166-178)   In the litigation that ensued, the Allergan Plaintiffs purportedly sold Allergan common stock during the period of February 25, 2014 through April 21, 2014, the end date of the "Class" Period.   It was not until April 22, 2014 that Valeant publicly disclosed its proposal to acquire Allergan.   See Carter Op. 13:25-14:1. In that initial proposal, Valeant offered to purchase Allergan common stock for $48.30 in cash, plus a .83 interest for each share in a Valeant share for each share of Allergan stock so exchanged.   Id.   After Valeant's initial and subsequent offers were rejected, Valeant formally commenced the launch of a tender offer by filing a Form S-4 registration statement. See SAC at ¶166.

While it is true that no shares of Valeant stock were ever purchased or sold by the Allergan Plaintiffs, this is not dispositive of the central coverage question – e.g., whether Valeant's offers, both prior to and during the tender offer process – which included offers to purchase Allergan stock in exchange for a portion of Valeant stock and cash – constitute "offer[s] to purchase or sell" Valeant securities.

The Allergan SAC alleged that the subject tender offer, (made after Pershing and Valeant benefitted by purchasing the shares of Allergan at a bargain price), included an offer to exchange Allergan stock for Valeant stock and cash:

The next day, on April 22, 2014, Valeant
delivered to Allergan a formal, unsolicited
proposal offering to acquire Allergan for
$48.30 in cash *and .83 of Valeant stock per
Allergan share – representing a price per
share of approximately $160 per share and a
value of over $46 billion based on Valeant's
then-stock price.*

Where, as here, a tender offer includes, *inter alia*, an
offer to exchange shares of Allergan for shares of Valeant, I am
persuaded that this intended transaction must be viewed as
implicating the purchase and sale of both Allergan and Valeant
securities.   I am, thus, entirely satisfied that Valeant's
tender offer, which offered to exchange shares of Allergan stock
for shares of Valeant stock, constituted an offer to "sell"
Valeant stock.

6. **The Allergan Plaintiffs' Claims Allege An "Offer To Sell" Valeant Securities.**

The Cross-Moving Defendants next urge that since the tender
offer was never consummated, Valeant's assertion that it is
entitled to coverage for the Allegan claims, must fail.   I
disagree.   The definition of a "Securities Claim" covers not
only claims for the purchase or sale of Valeant securities but
also includes an "*offer* to purchase or sell any securities of"
Valeant.   Here, despite the failed scheme, Valeant, in fact,
made such a tender offer. (*See* SAC ¶¶ 7, 166;   Carter Op.
13:25-14:1)   Since an *offer* to sell Valeant stock in exchange
for shares of Allergan stock constitutes an offer to sell

-63-

Valeant securities, the criteria of an "offer to sell" Valeant stock has, in my view, clearly been met.

       7.   **The Perils of a Moral Hazard In This Case Are Overstated and Insufficient to Warrant a Denial of Coverage.**

Nor am I moved by the Cross-Moving Defendants' assertion that finding coverage exists under the circumstances alleged here will create a "moral hazard." *See* Defendant AIG Brief filed 6/30/2020 at 27 n.15.

A "moral hazard" may arise when the existence of the insurance coverage itself creates a likelihood that an insured will purposely engage in misconduct or exercise such indifference or lack of care that the risk of the insured-against loss is heightened or increased. As explained by New Appleman on Insurance Law:

> [m]oral hazard describes a behavioral reaction when a party is protected from the consequences of a risk. The protected party . . . may have a tendency to act less carefully because someone else will bear the consequence of any resulting loss. The less careful behavior makes it more likely that a loss will occur.

New Appleman on Ins. Law Libr. Ed. § 1.01[4][b] (2011)).

In this District, Judge Chesler has rejected the moral hazard argument's applicability to insurance coverage for breach of contract, embracing Judge Posner's prior insightful comments on "moral hazard:"

> [I]nsurance policies are presumed not to
> insure against liability for breach of
> contract. The reason is the severe "moral
> hazard" problem to which such insurance
> would often give rise. The term refers to
> the incentive that insurance can create to
> commit the act insured against, since the
> cost is shifted to the insurance company. An
> example is the incentive to burn down one's
> house if the house is insured for more than
> its value to the owner. Or suppose, having
> somehow persuaded an insurance company to
> insure you against liability for breach of
> contract, you hire a contractor to build an
> extension on your house and after he has
> completed his work you refuse to pay him,
> and, when he sues, you turn his claim over
> to the insurance company.

*PNY Techs., Inc. v. Twin City Fire Ins. Co.*, Civ. Action No. 11-4647 SRC, 2014 *WL* 3519074, at *5 (D.N.J. July 16, 2014)(citing *Krueger Int'l, Inc. v. Royal Indem. Co.*, 481 F.3d 993, 996 (7th Cir. 2007)), *aff'd,* 607 *F. App'x* 155 (3d Cir. 2015)).

"Moral hazard" has also served as a basis for "owned property" exclusions. *See*, Ostrager and Newman, *Handbook on Insurance Coverage Disputes* § 10.03[b] at 441 (8th ed. 1995)(noting the purpose is to "protect against the moral hazard problem where an insured has less incentive to take precautions owing to the existence of insurance."); *see also Weedo v. Stone-E-Brick, Inc.,* 81 *N.J.* 233, 247 (1979)(noting that business risk exclusions exclude claims for deficient work or breach of contract). As Judge Posner has further explained:

It would be passing strange for
an insurance company to insure a pension
plan . . . against an underpayment of
benefits . . . because of the
acute moral hazard problem      that
such coverage would   create . . .
Such insurance would give the plan and its
sponsor an incentive to adopt aggressive
(just short of willful) interpretations of
ERISA designed to minimize the benefits due,
safe in the belief that if, as would be
likely, the interpretations were rejected by
the courts, the insurance company would pick
up the tab. Heads I win, tails you lose.

Waste Corp. of Am. v. Genesis Ins. Co., 382 *F. Supp. 2d* 1349,

1355 (S.D. Fla. 2005), aff'd, 209 *F. App'x* 899 (11th Cir.

2006)(citing *May Dept. Stores Co. v. Fed. Ins. Co.,* 305 *F.3d* 597

(7th Cir.2002)); see also, *Pac. Ins. Co. v. Eaton Vance Mgmt.,*

369 *F.3d* 584, 593 (1st Cir. 2004).

The Cross-Moving Defendants' reliance on *Liss v. Federal*

*Ins. Co.,* No. MRS-L-184501, 2004 *WL* 5663962 (N.J. Super. Law.

Div. June 29, 2004), in support of their moral hazard argument

is misplaced. In *Liss*, a former employee sought to redeem his

shares in the company with an agreed upon value of $1.45

Million. *Id.* Thereafter, the company underwent a

restructuring, leaving it an empty shell, devoid of assets

sufficient to pay the former employee. In response to the

former employee's subsequent claims for redemption, the company

sought coverage under its Director's and Officer's coverage,

-66-

asserting that the company's inability to redeem the former employee's stock was the result of corporate mismanagement, rather than a purposeful transfer designed to remove its assets from the former employee's reach. *Id.* The trial court declined to allow the company to shift its obligation to redeem its employee's shares to the insurance company, noting that if it were to do so, "[i]nsurers would then be insuring against risks that are far more likely to occur simply because of the insurance. This phenomenon is called 'moral hazard.'" *Id.* The trial court reasoned that "to permit insurance against consequences of intentional misconduct would encourage insureds to engage in wrongdoing when advantageous and leave the financial consequences to the insurer." *Id.*

Not only are the facts of this unreported trial level decision substantially distinguishable from those present here, but its initial conclusion that no coverage existed was ultimately rebuffed in two separate Appellate Division panels. In the first appeal, *Liss v. Federal Ins. Co.*, No. A-6863-03T5, 2006 *WL* 2844468 (N.J. Super. Ct. App. Div. Oct. 6, 2006) ("Appeal I"), the Appellate Division reversed the trial court's entry of summary judgement in favor of the carrier, remanding for a trial on the merits of the underlying claims notwithstanding the parties having entered into a *Griggs*

settlement[25] in which the insured had assigned his rights in the policy to Liss.[26]

Here, Defendants contend that Valeant's interpretation of a "sale" creates a "moral hazard" because it incentivizes companies to include an interest in their own stock as part of a tender offer, in order to create coverage for any ill consequences of their actions. Here, there is no allegation that Valeant attempted or intended to shift liability for a breach of contract to its insurers, nor of any indifference or perceived negligence in formulating and/or launching its tender offer, thereby causing or contributing to its failure. Nor has it been alleged that Valeant included its stock in its tender offer for the purpose of triggering insurance coverage. Indeed, it is undisputed that Valeant contemplated on exchange of .83 share of its own stock per Allergan share as part of its tender offer because it was ill-equipped to finance the proposed acquisition without doing so. *See* Tentative Order, 2018 WL 3912934, at *30. Such an exchange ratio, (nearly one for one),

---

[25] *Griggs v. Bertram*, 88 N.J. 347, 364-67 (1982).

[26] See also, *Liss v. Federal Ins. Co.*, No. A-0006-07T2, 2009 WL 231992 (N.J. Super. Ct. App. Div. Feb. 3, 2009) ("Appeal II") in which a second panel of the Appellate Division affirmed the trial court's ultimate holding on remand that Federal's insurance policy did provide coverage to satisfy the *Griggs* settlement reached between Liss and Federal's insured.

hardly bespeaks of the type of sham tender offer that might trigger a more solidly based "moral hazard" argument.[27]

8. **The Consequence of Claims of Allergan Plaintiffs Falling Outside the Allergan Actions Class Period**

The Cross-Moving Defendants next assert that the claims alleged by the Allergan Plaintiffs are not "Securities Claims" under the 2013-2014 Policies because the tender offer took place outside the class period. This argument fails as well, inasmuch as it overlooks, or at best glosses over the very essence of a Williams Act claim, and ignores the harm suffered by uninformed investors.

As noted by Judge Carter, the Williams Act sought to quell the practice of tender offerors intentionally leaking information to institutional investors "because such a practice is unfair to investors who are trading at an informational disadvantage." *In re Allergan*, No. 814CV02004DOCKESX, 2018 WL 3912934, at *18)(citing SEC Adopting Release at 60,412).

In fact, when the SEC enacted Rule 14e-3, it noted:

---

[27] During oral argument, Valeant asserted there is no support for the conclusion that coverage should be precluded on the basis of moral hazard as the Cross-Moving Defendants failed to reference any recognized public policy that would render coverage inappropriate and that, in any event, to address this, in advance of resolving the scope of coverage is premature. While persuasive, I find in any event, that the current pleadings and available record reveal no basis on which to conclude that finding coverage would constitute a moral hazard.

> [i]f furnished with the information, these
> security holders would be able to make an
> informed investment decision, which could
> involve deferring the purchase or sale of
> the securities until the material
> information had been disseminated or until
> the tender offer had been commenced or
> terminated.

*Id.* at *19.

Thus, the class period in a Williams Act claim can never encompass the date the tender offer became public. *See, e.g., In re Veeco Instruments, Inc. Sec. Litig.,* 235 *F.R.D.* 220, 241 (S.D.N.Y. 2006) (class period ending the day before the corrective disclosure); *see also, In re Sci.-Atlanta, Inc. Sec. Litig.,* 571 *F. Supp. 2d* 1315, 1344 (N.D. Ga. 2007) ("Numerous courts have held that, in a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market").

It is precisely this lack of pertinent knowledge, (that is known to others), that creates the complained of harm.  In fact, had any of the Allergan Plaintiffs been informed of the Valeant tender offer before the close of the class period, they would undoubtedly have been disqualified and excluded from the class.

Indeed, it is the Allergan Plaintiffs' lack of knowledge and resultant undervaluation of their stock that is at the very

-70-

heart of their claims.  As such, this final contention that Valeant's offer to exchange Allergan stock for Valeant stock cannot constitute a "securities claim" must, likewise, be rejected.

9. **There Are No Disputed Material Facts That Prevent Entry of Judgment On The Pleadings**

Finally, the Cross-Moving Defendants assert that judgment cannot be entered in Valeant's favor because its motion hinges on facts not in the record.  Cross-Moving Defendants' Moving Brief at 22 n.12.  Specifically, they assert that "but for" Valeant's decision to use its stock as payment for the Allergan stock, the tender offer would not have included Valeant stock, claiming Valeant admitted it could have otherwise financed the tender offer.  *See* Cross-Moving Defendants' Moving Brief at 22 n.12 (citing SAC ¶¶80, 143, 157-58, 177).  Once again, I respectfully disagree.  Whether or not Valeant could have funded the tender offer with cash is not a disputed material fact precluding the entry of judgment.  Nor is it of any moment or practical significance, as it is undisputed that Valeant's tender offer did, in fact, include the exchange of Valeant stock for Allergan stock.

## CONCLUSION AND RECOMMENDED ORDER

Having made a careful review of the parties' respective submissions, the relevant cases and statutory provisions, and having heard and considered the comprehensive and enlightening oral arguments of counsel, I am satisfied that the claims alleged by the Allergan Plaintiffs do, indeed, fall within the definition of "Securities Claims" under the Policies, and as such, constitute covered claims. Based upon the foregoing, it is my recommendation to the District Court that the motion for judgment on the pleadings brought by Valeant under Fed. R. Civ. P. 12(c)(ECF No. 233) be GRANTED and the cross-motion for judgment brought by AIG Canada and the 2013-2014 Excess Insurers be DENIED.

Pursuant to the Order Appointing Special Master entered April 12, 2019 (Docket Entry No. 197) at ¶7, and Fed. R. Civ. P. 53(f)(1), (2), the parties may object to, move to adopt, or move to modify an order pursuant to this paragraph within twenty-one (21) days of the day this order is entered on CM/ECF. Any party opposing the objection or motion shall file a responsive brief

within fourteen (14) days thereafter.  The objecting or moving
party may file a reply to any opposition brief within seven (7)
days of the day such opposition was filed.


                    Respectfully submitted,



              By: _____
                    Hon. Douglas K. Wolfson, J.S.C. (Ret'd.)
                    Special Master
                    The Weingarten Law Firm


Date:  June 28, 2021


-73-

**APPENDIX**

**TABLE OF COVERAGE ON 2013-2014 PROGRAM[28]**

| Coverage Layer | Insurer |
|---|---|
| First $5 Million | Deductible/Retention by Valeant |
| $10 Million | AIG Canada Insurance Company of Canada |
| $10 Million x/s $10 Million | Lloyd's Syndicate AWH 2232 |
| $10 Million x/s $20 Million | Allianz Global Risks US Insurance Company |
| $10 Million x/s $30 Million | Lloyd's Syndicate CVS 1919 |
| $10 Million x/s $40 Million | Hartford Fire Insurance Company |
| $10 Million x/s $50 Million | Everest Insurance Company of Canada |
| $10 Million x/s $60 Million | Liberty International Underwriters, a division of Liberty Mutual Ins. Company |
| $10 Million x/s $70 Million | Arch Insurance Canada Ltd. |
| $20 Million x/s $80 Million | Lloyd's Syndicate QBE 1886 (75% share) Lloyd's Syndicate ANV 1861 (25% share) |
| $10 Million x/s $100 Million | Royal & Sun Alliance Insurance Company of Canada |
| $15 Million x/s $110 Million | AIG Canada Insurance Company of Canada |
| $15 Million x/s $125 Million | Temple Insurance Company |

---

[28] These coverage limits were set forth in Paragraphs 36-38 of the Complaint filed in this matter and Defendant AIG Canada's Brief dated June 30, 2020 at 17 & Appendix.

| $10 Million x/s $140 Million | Lloyd's Syndicate Mitsui 3210 |
|---|---|