**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 18-493 (MAS) (LHG) |
| v. | **MEMORANDUM OPINION** |
| AIG INSURANCE COMPANY OF CANADA *et al.*, | |
| Defendants. | |

**SHIPP, District Judge**

     This novel matter of insurance contract interpretation comes before the Court on the Report and Recommendation (the "Report") of the Special Master, the Honorable Douglas K. Wolfson, J.S.C. (ret.), which recommended granting Plaintiffs' motion for judgment on the pleadings and denying Defendants' cross-motion for judgment on the pleadings. (ECF No. 265.) Defendant Allianz Global Risks US Insurance Company ("Allianz") objected to the Special Master's Report, to which a group of insurer Defendants joined. (ECF No. 272.)[1] Plaintiffs Valeant Pharmaceuticals International, Inc. ("Valeant"), Valeant Pharmaceuticals International ("Valeant USA"), and

---

[1] Specifically, the following Defendants joined Allianz's objection: (1) Hartford Fire Insurance Company (ECF No. 273); (2) Arch Insurance Canada Ltd. (ECF No. 274); (3) Everest Insurance Company of Canada (ECF No. 275); (4) Liberty International Underwriters, Liberty Mutual Insurance Company, Royal & Sun Alliance Insurance Company of Canada, Certain Underwriters at Lloyd's, London subscribing to Policy No. QB078613, and Certain Underwriters at Lloyd's, London subscribing to Policy No. QB078913 (ECF No. 276); and (5) Temple Insurance Company and Certain Underwriters at Lloyd's, London subscribing to Policy No. QB146013 (ECF No. 277) (collectively and together with Allianz, "Objectors").

AGMS, Inc. (collectively, the "Valeant Entities") opposed (ECF No. 288), and Allianz replied (ECF No. 296).[2] The Court has carefully reviewed the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court substantially adopts the Special Master's Report.

## I.    **BACKGROUND**

In this case, the Valeant Entities seek insurance coverage for potential insider-trading liability stemming from their failed takeover of Allergan, Inc. ("Allergan"). The battle lines are straightforward: the Valeant Entities contend that the insurance policies cover the incurred liabilities and costs; the Objectors assert the opposite. Although the disposition of this case will ultimately declare whether the Objectors must cover the Valeant Entities' liabilities, the question before the Court now is a more mundane—albeit novel—issue of insurance contract interpretation. Specifically, the parties ask the Court to answer a threshold question of whether a "securities claim," as that term is defined in a 2013–14 insurance policy, encompasses the claims asserted against the Valeant Entities in the underlying insider-trading litigation. The answer lies in a nuanced understanding of the facts leading to that litigation, which the Court recounts below.

But first, a few introductory matters. Ordinarily, the Court may not consider documents outside the four corners of the complaint on a motion for judgment on the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Well-worn exceptions to

---

[2] The same Defendants that joined Allianz's objection joined Allianz's reply. (ECF No. 297 (joinder of Liberty International Underwriters, Liberty Mutual Insurance Company, Royal & Sun Alliance Insurance Company of Canada, Certain Underwriters at Lloyd's, London subscribing to Policy No. QB078613, and Certain Underwriters at Lloyd's, London subscribing to Policy No. QB078913); ECF No. 298 (joinder of Temple Insurance Company and Certain Underwriters at Lloyd's, London subscribing to Policy No. QB146013); ECF No. 299 (joinder of Hartford Fire Insurance Company); ECF No. 300 (joinder of Arch Insurance Canada Ltd.); ECF No. 301 (joinder of Everest Insurance Company of Canada).)

this rule exist, however, including that the Court may take judicial notice under Federal Rule of Evidence 201 of documents in prior litigation referenced in the complaint. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999); *Iacaponi v. New Amsterdam Cas. Co.*, 379 F.2d 311, 311-12 (3d Cir. 1967). Those exceptions are especially strong "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Burlington Coat Factory*, 114 F.3d at 1426 (alteration in original) (citation omitted). The Court will take judicial notice of the most recent complaint filed in the underlying insider-trading litigation (the "Underlying Complaint"). Here, the Valeant Entities' Complaint expressly references that litigation, and the Court cannot resolve the dispute over what qualifies as a "securities claim" without relying on the facts alleged in the Underlying Complaint. (*See* Compl. ¶¶ 72-73, ECF No. 1-1; *id.* ¶ 74 (summarizing Underlying Complaint).) To be sure, neither party contests the relevance of the underlying factual allegations in resolving this matter, and the Court has no reason to doubt those facts' relevance. *Cf. Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002) ("[W]e discern no error with the district court's references to the *Cureton* litigation, as the body of the complaint itself expressly references the findings and statements made in that factually similar case.").

Similarly, the Court considers the underlying insurance policies in its decision today. The Valeant Entities did not attach the policies to their Complaint but instead to their motion for judgment on the pleadings. (*See* Pls.' Mot. Exs. A-M, ECF No. 233-3 to -15.) The Complaint, however, liberally quotes from and references the insurance policies, leading the Court to conclude that those policies are integral to the Complaint. *See Burlington Coat Factory*, 114 F.3d at 1426 ("[A] document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." (second alteration in original)

(citations omitted)); *Hammond v. U.S. Liab. Ins. Co.*, No. 14-847, 2015 WL 401503, at *7 n.1 (W.D. Pa. Jan. 28, 2015) (considering insurance policy attached to answer and noting that courts evaluating motions for judgment on the pleadings may consider "the pleadings and attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiffs' claims are based on the documents, and matters of public record." (citations omitted)).

The Court will also consider several public records filed with the SEC, including Valeant's and Pershing's April 21, 2014 Schedule 13D filings, Valeant's June 18, 2014 Schedule TO filing, and Valeant's June 18, 2014 S-4 Registration Statement. SEC filings are "matters of public record of which the court can take judicial notice." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citations omitted); *see also In re Tableau Software, Inc. & Salesforce.com, Inc. Deriv. Litig.*, No. 20-467, 2021 WL 495149, at *2 (D. Del. Feb. 10, 2021) (citations omitted) (noting that SEC filings are "trustworthy public records"). Again, to be sure, none of the parties question the factual accuracy of the underlying SEC filings. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

The Court of course recognizes that by considering these documents, its Memorandum Opinion may appear to moonlight as one for summary judgment. The Court, however, does not find anything improper by considering these documents at this stage. The parties ask for a legal determination of what a "securities claim" is under an insurance policy, not an intricate factual question necessitating the Court's reliance on contested facts. In other words, the Court considers these adjudicative facts not for their truth but instead for their existence, which the parties do not dispute. The parties have had ample opportunity to be heard on the issue of judicial notice—both through oral argument before the Special Master and again through objection to the Undersigned.

*See* Fed. R. Evid. 201(e) ("[A] party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard."). The Objectors limit their judicial-notice objections to an insurance policy from another case and a tentative summary judgment opinion in the underlying insider-trading litigation, neither of which the Court takes judicial notice of today. Further, to the extent this Memorandum Opinion reads as a summary judgment opinion, the Court credits that reading to the advanced stages of the insider-trading litigation, which was filed in 2014. All that to say that the Court cannot countenance how its decision today would be any different with additional discovery.

### A.     Valeant Sets Its Sights on Smaller Pharmaceutical Targets.

Crucial to this dispute is understanding Valeant's unusual corporate strategy. Valeant was a Canadian company that manufactured several prescription and over-the-counter drugs and medical devices. (Second Am. Compl. ¶ 26, *In re Allergan, Inc. Proxy Sec. Litig.*, No. 14-2004 (C.D. Cal. Apr. 21, 2016), ECF No. 138.) Unlike its competitors, however, Valeant eschewed traditional investments in research and development for its own drug brands. (*Id.* ¶ 31.) In 2013 alone, for example, Valeant spent only three percent of its sizeable revenue on research and development. It instead embarked on a campaign to gobble up smaller pharmaceutical companies that had already done the work. (*Id.*) That approach—spearheaded by CEO Michael Pearson ("Pearson")—allowed Valeant to avoid the uncertainties and costs associated with lengthy drug trials and approvals and to access retail drug markets with established brand names. (*Id.*) It also meant, however, that Valeant would slash payrolls and research-and-development budgets for newly acquired companies in the hopes of maximizing short-term profits. (*Id.*)

The slash-and-burn campaign employed by Valeant was not without its limits. Engaging in over 100 transactions since 2008, Valeant's acquisition-driven machine demanded cash to fuel

the influx of newly added companies. (*Id.* ¶¶ 31-32.) When cash dried up, Valeant turned to another source of funds: debt. Through leveraged finance, Valeant was able to continue acquiring high-value brands but at the cost of bloating its balance sheets. (*Id.*) For example, Valeant acquired Bausch & Lomb Holdings, Inc. in August 2013 in a debt-financed $8.6 billion transaction. (*Id.* ¶ 67.) By 2014, however, that transaction and others left Valeant in a precarious position— although it needed to continue to absorb other companies to compensate for its research-and-development shortcomings, Valeant's lopsided debt position made it increasingly unattractive to creditors looking to finance Valeant's growth. (*Id.* ¶ 34 ("[B]y early 2014 . . . , financing to fund [Valeant's] acquisitions was becoming scarce.").)

Enter Allergan. Allergan was an established, global company with over 10,000 employees and a healthy research-and-development budget. (*Id.* ¶¶ 24-25.) In other words, a prototypical target for Valeant as it had everything Valeant craved: product lines that could be monetized, payrolls that could be trimmed, and research-and-development budgets that could be slashed. Unsurprisingly then, Valeant attempted to court Allergan on several occasions. In September 2012, Pearson contacted David Pyott (Allergan's CEO) to discuss a potential combination, only to be swiftly rebuffed by the Allergan Board of Directors. (*Id.* ¶ 64.) Pearson continued his overtures toward Allergan into 2013 and 2014—at one point noting that Allergan was the "most attractive strategic transaction available to Valeant." (*Id.* ¶ 65.) Still, the recalcitrant Allergan Board was far from Valeant's only roadblock in its attempted acquisition of Allergan. Allergan was a $37 billion company that would demand more cash than Valeant had on hand and more debt than Valeant's creditors were willing to finance. (*See id.* ¶ 69 (noting that by February 2014, Valeant knew it did not have enough money to purchase a toehold in Allergan and that its debt position made a hostile takeover bid "prohibitively expensive").)

**B.      Cash-Starved Valeant Seeks Out Pershing to Help Acquire Allergan.**

So Valeant devised a plan. It would conscript a third party that had ready access to both capital and Allergan shares to buy an initial stake in Allergan. That way, Valeant could avoid the debt associated with more traditional financing options, such as investment banks. (*Id.* ¶ 143 ("Pearson explained that while [Valeant] could have paid an investment bank like Goldman Sachs to help it run a tender offer and proxy contest for Allergan . . . , the problem was that '[w]e would have to pay for it.'" (second alteration in original)).) Valeant found willing participants to its scheme in William Ackman ("Ackman") and his cabal of hedge funds (collectively, "Pershing"). (*Id.* ¶ 70.) The complex plan had five relevant steps: (1) Pershing would acquire a significant position in Allergan (called a "toehold") and vote its shares in favor of a Valeant-Allergan combination; (2) Pershing would then use its shareholder status to force out Allergan Board members that were resistant to Valeant's overtures; (3) in exchange, Valeant would provide Pershing with advance notice of its intentions to acquire Allergan—meaning Pershing could buy Allergan shares on the cheap and later reap windfall returns; (4) also in exchange, Valent would provide roughly $75 million to fund a vehicle that would acquire Allergan; and (5) Pershing would kick back a part of its profits to Valeant if another entity acquired Allergan. (*See id.* ¶ 46.)

Valeant and Pershing memorialized their deal on February 25, 2014 (the "Relationship Agreement"). (*Id.* ¶ 102.) The secret Relationship Agreement was the culmination of three weeks of negotiations between the pair, during which Valeant disclosed its intentions to acquire Allergan through a tender offer to Allergan's shareholders. (*Id.*) That Valeant sought an acquisition strategy that circumvented Allergan's Board by appealing directly to the shareholders was not surprising because Allergan had thus far rebuffed every one of Valeant's attempts at a friendly merger. (*See, e.g., id.* ¶ 86 ("[O]n February 10, 2014, analysts from Sanford B. Bernstein & Co. published a report on their meetings with Allergan's senior management, which had informed Bernstein that

7

the companies had 'very different business models,' were '[n]ot a good fit,' and that 'shareholders w[ould] hesitate to take Valeant paper.'"); *id.* ¶ 89 ("Allergan's known enmity towards a transaction with Valeant was also clearly set forth in Valeant's own internal documents, which confirm that Defendants always knew hostile tactics—including a tender offer—would be necessary.").) To that end, discussions of a tender offer to Allergan's shareholders saturated the weeks leading up to the deal between Valeant and Pershing:

- On February 7, 2014, Valeant discussed a Valeant-Allergan combination on a conference call and noted that its counsel was "[p]ulling together key diligence items" and "[w]orking on structure and key actions to launch offer." (Second Am. Compl. ¶ 80 (alterations in original) (emphasis omitted).)

- During the week of February 14, 2014, Valeant held a board meeting where a presentation described a tender offer to Allergan shareholders as a "[h]ostile cash and stock merger." (*Id.* ¶ 96 (alteration in original) (emphasis omitted).)

- Similarly, on February 15, 2014, a Valeant executive emailed Pearson that the "Allergan Opportunity" would be pursued through a "[h]ostile cash and stock merger." (*Id.* (alteration in original) (emphasis omitted).)

- On February 16, 2014, Valeant sent internal communications indicating that it expected Allergan to adopt a shareholder rights' plan (a "poison pill"), rendering any potential tender offer difficult. (*Id.* ¶ 89.) Ackman later acknowledged that Pershing would need to replace the Allergan Board, remove the poison pill, and clear the way for Valeant's tender offer. (*Id.* ¶ 92 ("[Ackman:] 'We were going to call a special meeting. The plan was to call a special meeting and replace the Board.'").)

- On February 18, 2014, Valeant's Canadian counsel discussed with Pershing's counsel that Pershing would be a "co-bidder" if the Valeant-Allergan combination proceeded "by way of tender offer." (*Id.* ¶ 98 (emphases omitted).)

- On February 20, 2014, Ackman sent Pearson a draft Relationship Agreement, where he described that if Valeant pursued Allergan "through a tender offer," then Pershing would be a co-bidder. (*Id.* ¶ 102(c) (emphasis omitted).)

- A draft Relationship Agreement on February 23, 2014, likewise stated that Pershing would be a co-bidder if Valeant launched a tender offer. (*Id.* ¶ 102(d).)

- Another draft Relationship Agreement on February 24, 2014, stated that Valeant and Pershing must first agree for "either party to launch a tender offer or an exchange offer." (*Id.* ¶ 102(e) (emphasis omitted).)

The barrage of communications by Valeant and Pershing implies that, by the time Valeant and Pershing consummated their Relationship Agreement, both parties knew that Valeant would likely launch a tender offer and that any tender offer would likely include cash and Valeant stock as consideration. (*Id.* ¶ 103 ("Thus, drafts of the very document establishing the mechanism through which Ackman would acquire Allergan shares, on their face, evidence that Valeant was contemplating a hostile tender offer all along.").)

The Relationship Agreement also provided added protection for Valeant to acquire Allergan. For one, it provided some cover for Valeant if its gambit to acquire Allergan failed. Recognizing that its advances on Allergan would drive up the Allergan share price, Valeant and Pershing agreed that fifteen percent of whatever windfall Pershing realized from its Allergan shares would revert to Valeant. (*Id.* ¶ 145; *see also* Valeant Pharms. Int'l, Inc., Registration Statement (Form S-4) 39 (June 18, 2014) [hereinafter Valeant S-4 Registration Statement] ("Valeant would have a right to 15% of the net profits otherwise allocable to Pershing Square if, before dissolution and at a time when a Valeant business combination proposal for Allergan is outstanding, a proposal for a third[-]party business combination with Allergan is outstanding or made . . . .").) In addition, Valeant and Pershing agreed that Pershing would help finance any acquisition of Allergan by purchasing $400 million in Valeant shares at a fifteen-percent discount. Valeant S-4 Registration Statement 39 ("[A]t the election of Valeant, immediately prior to consummation of a Valeant business combination with Allergan, Pershing Square would purchase

for $400 million Valeant common shares at a per share price reflecting a 15% discount to the then current market price . . . ."). This financing clause is notable not only because it gave Pershing a financial stake in Valeant's acquisition of Allergan but also because it reflects Valeant's use of its securities to help get a deal with Allergan done.

After it executed the Relationship Agreement, Pershing engaged in a covert campaign to acquire Allergan shares. Using an LLC it set up in early February ("PS Fund 1"), Pershing first acquired 600,000 Allergan shares directly in late February—an amount just below Valeant's reporting threshold under the Hart-Scott-Rodino Act. (Second Am. Compl. ¶ 114.)[3] PS Fund 1 next acquired roughly $2 billion in Allergan shares between March and early April 2014, but it did not do so directly. Instead, it purchased "deep in-the-money, American-style, over-the-counter, zero-strike call options" through a counterparty. (*Id.* ¶ 115.) If that sounds confusing, it is. In essence, PS Fund 1 purchased options valued at one percent of Allergan's current stock price that it could later convert to full-price Allergan shares. (*See id.* ¶ 116; *id.* ¶ 117 ("[Ackman:] 'On a stock trading for $125 there are 1% strike options. They act economically, identically, to shares.'" (emphasis omitted)).) The benefit of these covert purchases to Pershing (and Valeant) was two-fold: for one, the Hart-Scott-Rodino Act does not require public disclosure of options convertible to a company's stock. (Second Am. Compl. ¶ 116.) But perhaps more significantly, Pershing faced almost no downside from its options buy because it knew that Valeant's tender offer was coming. So long as the tender offer materialized—and Allergan's stock price shot up— Pershing could (based on the options' expiration date) either offload its options at a premium or

---

[3] PS Fund 1 bought these shares with $75.9 million in capital that Valeant had pledged in the Relationship Agreement. (Second Am. Compl. ¶ 111; *see also* Valeant S-4 Registration Statement 89 ("Pursuant to the Pershing Square relationship letter, Valeant contributed $75.9 million to a newly formed jointly owned entity (which thereafter became known as PS Fund 1).").)

convert the options to lucrative Allergan shares. Either way, knowledge of the tender offer was a win-win for Pershing.

By early April, Pershing had acquired 4.9% of Allergan, just below the SEC's five-percent reporting threshold. (*Id.* ¶ 120.)[4] For Pershing to continue buying, however, it would need to report any purchase putting it over a five-percent threshold within ten days of the purchase. (*Id.* ¶ 122.) Specifically, within ten days, it would need to file a Schedule 13D with the SEC apprising the market of its status as a beneficial owner (a shareholder owning more than five percent of a company's stock). (*Id.* ¶¶ 120, 122.) So, Pershing began a "rapid accumulation program" on April 11, 2014, in which it bought another $2 billion in Allergan shares within ten days—eventually acquiring 9.7% of Allergan in total. (*Id.* ¶¶ 6, 122-23.) That meant that Pershing and Valeant had ten days to disclose to the market their true intentions.

**C.    Valeant Unveils Its Plans to Acquire Allergan.**

The clock ticking, Valeant and Pershing separately filed a Schedule 13D on April 21, 2014. (*Id.* ¶ 125.) The filings disclosed to the market for the first time that Pershing owned 9.7% of Allergan and that Valeant "intend[ed] to propose a merger in which [Allergan] shareholders will receive a combination of cash and Valeant common shares." Valeant Pharms. Int'l, Inc., Beneficial Ownership Report (Schedule 13D) 4 (Apr. 21, 2014); *see also* Pershing Square Cap. Mgmt., L.P., Beneficial Ownership Report (Schedule 13D) 6 (Apr. 21, 2014) (same). The next day, Valeant formally offered Allergan a deal that comprised roughly thirty percent cash and seventy percent securities: $48.30 in cash and 0.83 of Valeant stock per Allergan stock. (Second Am. Compl. ¶ 126.) But that offer was largely illusory because, as suggested in the Relationship Agreement,

---

[4] Although "acquire" may be too narrow a verb here as the bulk of Pershing's purchases were options convertible to Allergan shares—not Allergan shares outright. (*See* Second Am. Compl. ¶ 124.)

Valeant and Pershing knew that Allergan's Board would reject Valeant's proposal and force an exchange offer directly to the shareholders. (*E.g., id.* ¶ 127 ("In an investor presentation announcing the offer and Pershing's 10% position, Ackman made clear that Valeant and Pershing expected the transaction to be hostile, and that a tender offer was quite possible, if not imminent."); *id.* ¶ 133 ("Valeant knew that its 'friendly' offer to 'negotiate' its unsolicited proposal was just the first step of building pressure, leading to the inevitable tender offer.").) And, as expected, the Allergan Board rejected Valeant's offer in May 2014. (Second Am. Compl. ¶ 155.)

Valeant continued to ratchet up the pressure on the Allergan Board. In late May, it issued two more proposals for cash and fractional shares of Valeant stock; the Allergan Board summarily rejected both. (*Id.* ¶ 157 (alleging that the first offer was for $58.30 in cash and 0.83 shares of Valeant stock and that the second offer was for $72.00 in cash and 0.83 shares of Valeant stock).) Valeant also began a widely publicized media blitz to both compel the Allergan Board into action and ward off other competitors—a common ploy for companies planning a hostile takeover. (*E.g., id.* ¶ 136 (alleging that Valeant told Allergan customers and employees that the Valeant-Allergan combination was a "done deal").) Internally, Pershing upheld its part of the bargain and began readying for proxy contests to replace resistant Allergan Board members with more Pershing-friendly ones. (*Id.* ¶ 161.) Pershing did so not to empanel a board that would negotiate a deal with Valeant but rather to lift the poison pill put in place by the prior board. As Ackman put it, the Pershing-nominated board would "be elected, and the board could simply [lift the pill] and allow the exchange offer to close." (*Id.* (alteration in original) (emphasis omitted).)

On June 18, 2014, Valeant launched its much-anticipated exchange offer by filing its Schedule TO and S-4 Registration Statement with the SEC. (*Id.* ¶¶ 164, 166.) The Schedule TO included the terms of the tender offer to Allergan shareholders: $72.00 in cash and 0.83 shares in

Valeant stock per Allergan share. Valeant Pharms. Int'l, Inc., Tender Offer Statement (Schedule TO) 1 (June 18, 2014). To that end, the S-4 Registration Statement registered over 240 million Valeant shares necessary for the offer. (Second Am. Compl. ¶ 170.) Notably, the S-4 Registration Statement also indicated that Pershing's 28 million Allergan shares would be treated differently— namely, Valeant registered a separate pool of Valeant stock that would be used to buy Pershing's stake in Allergan. Valeant S-4 Registration Statement 80 ("On May 30, 2014, Valeant entered into the Pershing Square letter agreement with Pershing Square to exchange 28,281,107 shares of Allergan common stock allocated funds managed by Pershing Square for Valeant common shares at an exchange ratio of 1.22659 Valeant common shares for each share of Allergan common stock.").

All of this was in vain, however. In November 2014, Allergan announced that it had agreed to merge with another competitor (Actavis) at a price considerably higher than what Valeant offered. (Second Am. Compl. ¶¶ 177-78.) The Actavis-Allergan merger set in motion the protective clause of the Relationship Agreement: Valeant would recoup fifteen percent of any profits of Pershing's sale of Allergan shares. (*Id.* ¶ 180.) True to form, once the merger completed in March 2015, Pershing sold nearly $6 billion worth of Allergan shares, pocketed $2.5 billion in profits, and remitted $400 million to Valeant. (*Id.* ¶¶ 180, 182.) Its failed acquisition notwithstanding, Valeant's $400 million windfall was nothing to slouch at as it had only invested $75 million in PS Fund 1. (*Id.* ¶ 180 ("Considering that, from 2009 through 2013, Valeant lost an average of about $171 million annually, this windfall derived from Pershing's insider trading had a significant impact on Valeant's bottom line." (emphasis omitted)).) In other words, Valeant's pay day represented a more than 400% return on investment.

**D.      Its Gambit Unsuccessful, Valeant Faces the Repercussions.**

Not long after Allergan announced its merger with Actavis, groups of Allergan shareholders sued Valeant and Pershing under the federal securities laws. Eventually certified as a class, the shareholders were former holders of Allergan stock that sold their shares between February 25 and April 21, 2014—that is, the time in which Valeant's contemplated exchange offer was known only to the Relationship Agreement's drafters. (*Id.* ¶ 191.) According to the former shareholders, had they known Valeant's exchange offer was forthcoming, they never would have sold their shares at the artificially low prices. (*See id.* ¶ 206.) The artifice, of course, was that Valeant hid its intentions to acquire Allergan from everyone but Pershing and deprived Allergan's then-shareholders from reaping the rewards of that important news.

The shareholders assert that this deception violated the Williams Act's prohibitions on selectively communicating nonpublic news of a tender offer to third parties and trading on that nonpublic news. (*Id.* ¶ 198.) What is the Williams Act? Enacted in 1968, the statute arose to address an informational gap in the federal securities laws relating to coercive cash tender offers. Specifically, Congress sought to "ensure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975). The statute's sponsor confirmed that its purpose was chiefly one of correcting information asymmetries between tender offerors and recipient shareholders: "This legislation will close a significant gap in investor protection under the Federal securities laws by requiring the disclosure of pertinent information to stockholders when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977) (quoting 113 Cong. Rec. 854 (1967) (statement of Sen. Harrison Williams)); *see also Schreiber v. Burlington N., Inc.*, 472 U.S.

1, 8-9 (1985) ("Today, the public shareholder in deciding whether to accept or reject a tender offer possesses limited information. No matter what he does, he acts without adequate knowledge to enable him to decide rationally what is the best course of action. This is precisely the dilemma which our securities laws are designed to prevent." (quoting 113 Cong. Rec. 24667 (statement of Sen. Williams))).[5]

To that end, like other provisions of the Exchange Act, the Williams Act mandates a disclosure regime for tender offerors. At a minimum, tender offerors must file with the SEC "the 'background and identity' of the offeror, the source and amount of funds or other consideration to be used in making the purchases, the extent of the offeror's holdings in the target corporation, and the offeror's plans with respect to the target corporation's business or corporate structure." *Piper*, 430 U.S. at 22-23 (citing 15 U.S.C. § 78m(d)(1)). For good measure, the Williams Act also includes a broad antifraud provision in section 14(e), which (like the more familiar section 10(b)) prevents tender offerors from making any false or misleading statements regarding their offers. 15 U.S.C. § 78n(e); *see also Schreiber*, 472 U.S. at 10-11 ("[Section 14(e)] supplements the more precise disclosure provisions found elsewhere in the Williams Act, while requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b)."); *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 940 (2d Cir. 1969) (Friendly, J.) (analyzing Williams Act as first court of appeals to do so and noting that section 14(e) "applies Rule 10b-5 both to the offeror and the opposition" (citation omitted)).

---

[5] The Williams Act also applies to exchange offers notwithstanding that its origins lie in all-cash tender offers. *See, e.g., Piper*, 430 U.S. at 22-42 (analyzing Williams Act in context of exchange offer); *Schmidt v. Enertec Corp.*, 598 F. Supp. 1528, 1540 (S.D.N.Y. 1984) ("Despite Congress's primary interest in enacting legislation to protect public shareholders confronted with a cash tender offer, the Williams Act has been applied to exchange offers as well." (citation omitted)).

Subsequent rules promulgated by the SEC pinpoint precisely what constitutes fraudulent conduct under the Williams Act. For one, under Rule 14e-3(a), entities with advance knowledge of a prospective tender offer may not buy or sell securities in the target company "unless within a reasonable time prior to any purchase or sale such information and its sources are publicly disclosed by press release or otherwise." 17 C.F.R. § 240.14e-3(a) (2022); *see also* Tender Offers, 45 Fed. Reg. 60,410, 60,413 (Sept. 12, 1980) (codified at 17 C.F.R. pt. 240) (same). Similarly, under Rule 14e-3(d), an offeror may not selectively communicate a prospective tender offer to certain market participants if the offeror knows that those market participants will trade on that nonpublic information. 17 C.F.R. § 240.14e-3(d); Tender Offers, 45 Fed. Reg. at 60,416-17 ("Rule 14e-3(d) is the rule designed to prevent the selective communication of material, nonpublic information relating to a tender offer . . . ."). Together, these rules help prevent the unsavory insider-trading practice known as "warehousing," whereby "a corporation gives advance notice of its intention to launch a tender offer to institutional investors who then are able to purchase stock in the target company before the tender offer is made public and the price of shares rises." *Chiarella v. United States*, 445 U.S. 222, 234 (1980).

The shareholders' complaint alleges classic warehousing in violation of the Williams Act. It alleges that Valeant and Pershing conspired to acquire shares in Allergan with advance knowledge of Valeant's exchange offer—all in violation of the Williams Act's antifraud section 14(e) and the SEC's anti-warehousing Rule 14e-3. (*See* Second Am. Compl. ¶¶ 196-207.) The centerpiece of that cause of action is the harm caused by Valeant and Pershing's bid to conceal material information from the market: "The Class did not have the information required to be disclosed under Section 14(e) and Rule 14e-3 and therefore sold Allergan stock for an unfair and artificially low price." (*Id.* ¶ 206.) The shareholders' complaint also alleges derivative causes of

action, including control-person liability under section 20(a) of the Exchange Act and insider-trading violations under section 20A of the Exchange Act. (*See id.* ¶¶ 208-26.)

### E.   Valeant Seeks Coverage from Its Insurers.

Of course, this lawsuit does not concern the Williams Act litigation, at least not directly. What it does concern is Valeant's decision to seek coverage from its insurance providers for that litigation. As relevant here, during 2013 and 2014, Valeant purchased $10 million in primary coverage from AIG Insurance Company of Canada ("AIG") and $140 million in excess coverage from several other insurance companies (most of which are Objectors here). (Compl. ¶¶ 36-38, ECF No. 1-1.) The directors and officers (D&O for short) liability insurance policy with AIG (the "AIG Policy"), effective from September 28, 2013 to September 28, 2014, served as the operative policy for the future excess coverage policies. (*See id.* ¶ 39.) Each of the twelve excess coverage policies provided, with certain irrelevant exceptions, that "this policy is subject to the same insuring clauses, definitions, terms and conditions, exclusions, cancellation provisions and all other provisions of the underlying insurance." (*Id.*)[6] Thus, all the policies provided coverage for "any Securities Claims," defined as

> a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:
>
> (1) alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:
>
> (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer

---

[6] Accordingly, references throughout this Memorandum Opinion to the AIG Policy are coextensive with the 2013-14 excess coverage policies.

> or solicitation of an offer to purchase or sell any
> securities of an **Organization**; or
>
> (b) brought by a security holder or purchaser or seller of
> securities of an **Organization** with respect to such
> security holder's, purchaser's or seller's interest in
> securities of such **Organization**; or
>
> (2) which is a **Derivative Suit**.

(AIG Insurance Policy ("Policy") *11, *68, ECF No. 233-3.)[7] This litigation concerns the interpretation of a securities claim arising out of section 1(a) of the above—especially, whether the Allergan shareholders' claims allege, arise out of, are based upon, or are attributable to an offer to sell Valeant securities.[8]

The Valeant Entities contend that the Allergan shareholders assert securities claims, thereby meriting coverage under the AIG Policy. (Compl. ¶ 75.) The Objectors disagree and continue to deny coverage to the Valeant Entities. (*Id.* ¶ 81.) As relevant here, the Valeant Entities sued the Objectors (and others) for this purported breach of contract, asking the Court to declare that the 2013-14 insurance policies entitle them to coverage. (*Id.* ¶¶ 116-20.) After one of Defendants removed, the Valeant Entities filed a Motion for Judgment on the Pleadings, to which Defendants raised a Cross-Motion for Judgment on the Pleadings of its own. (*See* ECF Nos. 233, 238.)[9]

---

[7] Although the AIG Policy is separately paginated, the Court pin-cites it through the pagination atop the CM/ECF header for ease of reference. Pin-cites prefaced by asterisks refer to the CM/ECF pagination.

[8] The AIG Policy unambiguously defines "Organization" as Valeant and its subsidiaries. (Policy *8, *33.)

[9] The Valeant Entities voluntarily dismissed with prejudice their claims against AIG shortly before the Objectors' filed their objections. (ECF No. 270.)

**F.**     **The Special Master Issues a Thorough Report in Favor of the Valeant Entities.**

In his 75-page opinion, the Special Master recommended granting the Valeant Entities' motion and denying Defendants' cross-motion. In reaching that recommendation, the Special Master arrived at eight conclusions, five relating to the plain language of the AIG Policy and three rebuffing specific counterarguments by the Objectors:

<u>Plain Language of "Securities Claims" in the AIG Policy</u>

1.     The Valeant Entities are "Organization[s]" under the AIG Policy.

2.     The Exchange Act claims in the Underlying Complaint are "violation[s] of any law" under the AIG Policy.

3.     The Allergan shareholders qualify as "any person or entity" under the AIG Policy.

4.     The Exchange Act claims in the Underlying Complaint "alleg[e], aris[e] out of, [are] based upon, or [are] attributable to" Valeant securities under the AIG Policy.

5.     The Exchange Act claims in the Underlying Complaint pertain to an "offer to . . . sell" Valeant securities under the AIG Policy.

<u>Insurance Companies' Counterarguments</u>

6.     Covering the Valeant Entities' liability stemming from the Underlying Complaint will not create a moral hazard.

7.     That Valeant made the tender offer outside the Underlying Complaint's proposed class period was not a material fact precluding judgment on the pleadings.

8.     That Valeant could have made an all-cash tender offer was not a material fact precluding judgment on the pleadings.

(*See generally* R. & R. 36-73, ECF No. 265.)[10] The Court examines each category of conclusions in turn.

> ### 1.   The Special Master Concludes that the Underlying Complaint Asserts "Securities Claims."

Starting with the less controverted conclusions, the Special Master determined that Valeant was an "Organization," that the underlying Exchange Act violations were "violation[s] of law," and that the Allergan shareholders qualified as "any person or entity." (*Id.* at 39-43.) *First*, the Special Master analyzed the plain language of the AIG Policy and reasoned that it unambiguously defined Valeant and its subsidiaries as "Organization[s]." (*Id.* at 39 (citing Policy *33).) *Second*, the Special Master noted that the AIG Policy expressly covered "statutory" violations, meaning that violations under the Williams Act and the broader Exchange Act must qualify. (*Id.* at 39-42.) In so reasoning, the Special Master rejected the Objectors' arguments that the statutory violations were not the sort contemplated by the policies' drafters. For the Special Master, the Underlying Complaint's claims arose under the broad antifraud provisions of the Exchange Act—"precisely the type of violations contemplated under the plain meaning of 'Securities Claims' in the Policies." (*Id.* at 42 (citing, for example, *Applied Digit. Data Sys. Inc. v. Milgo Elec. Corp.*, 425 F. Supp. 1145, 1153 (S.D.N.Y. 1977)).) *Finally*, noting the AIG Policy's use of the word "any," the Special Master concluded that the Allergan shareholders unambiguously fell within the AIG Policy's definition of "person[s] or entit[ies]" alleging statutory violations. (*Id.* at 43.)

Next, the Special Master determined that the conduct in the Underlying Complaint alleged, arose from, was based upon, or was attributable to Valeant securities. (*Id.* at 44-58.) The Special Master devoted substantial ink to this conclusion, likely in recognition of its significance. Here's

---

[10] The Special Master's Report is also available on Westlaw: No. 18-493, 2021 WL 7903694 (D.N.J. June 28, 2021).

the problem: this is not a typical case where an issuer's securities are front and center in an elaborate regulatory fraud. For example, if an issuer lied about its revenues and profits in a publicly filed annual report, likely no one would question that the lie would be directly attributable to that issuer's securities. That's so because the eventual litigation would likely comprise the *issuer's shareholders* who purchased or sold the *issuer's securities* when the issuer lied to the market. Similarly, another easy case would arise if a group of an issuer's employees or agents received material nonpublic information about the issuer and then began trading on the issuer's securities en masse. Again, the subsequent litigation would almost certainly involve allegations of insider trading on the *issuer's securities*. This case is different. Here, the issuer (Valeant) stands accused of manipulating the securities of the target (Allergan) by conspiring with a third party (Pershing) to withhold news of a pending exchange offer (i.e., an offer of Valeant shares in exchange for Allergan shares) from the market. As one might expect, the subsequent litigation focuses on the target's shareholders and the target's securities—rendering the connection to Valeant securities somewhat murky. But is the tie-in so murky as to elude coverage under the AIG Policy?

No, according to the Special Master. Conducting a rigorous analysis of the terms "allege," "arise out of," "based upon," and "attributable to," the Special Master first noted that the plain terms of the AIG Policy listed the quartet disjunctively. (*Id.* at 44 & n.22.) That alone doomed the Objectors' contentions as the Underlying Complaint unequivocally *alleges* that Valeant and Pershing withheld knowledge of Valeant's exchange offer from the market. (*Id.* at 53 ("While the offer to purchase or sell Valeant securities may not be the singular focus of the SAC . . . , it does *allege* that this deflated price arose from, was related to, or was caused by Valeant's and Pershing's improper failure to disclose Valeant's anticipated tender offer.").) Still, likely recognizing that little authority existed on the meaning of the term "allege," the Special Master reviewed the

extensive caselaw analyzing the phrase "arise out of." (*See id.* at 44-50.) He reasoned that courts have adopted a dual approach to analyzing that phrase: liberal constructions for coverage provisions and narrow constructions for exclusion provisions. (*Compare id.* at 45 ("The phrase 'arising out of' has been defined broadly in other insurance coverage decisions to mean conduct 'originating from,' 'growing out of,' or have a 'substantial nexus' with the activity for which coverage is provided." (quoting *Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 713 A.2d 1007, 1010 (1998))), *with id.* at 47 ("[I]nsurance policy exclusions must be narrowly construed." (quoting *Foodtown, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 05-3627, 2008 WL 3887617, at *2 (D.N.J. Aug. 20, 2008))).) Because "arise out of" related to coverage under the AIG Policy, therefore, the Special Master afforded the phrase a broad construction—concluding that the violations of law alleged in the Underlying Complaint originated from, grew out of, or bore a substantial nexus to the offer of sale of Valeant shares. (R. & R. 53.)

In so concluding, the Special Master also rejected the Objectors' reliance on cases that denied coverage for circumstances beyond the ken of the policy drafters. In one example, a district court denied additional insured coverage in an insurance policy that covered conduct "arising out of work or operations performed by the main policyholder." *Markel Int'l Ins. Co. v. Centex Homes, LLC*, No. 05-3540, 2006 WL 278920, at *5 (D.N.J. Feb. 2, 2006). The facts are akin to a first-year law student's torts exam. A residential housing construction company (Centex) contracted a masonry company (Alpha Contractors) to construct masonry posts in a housing development. *Id.* at *1. Alpha Contractors' insurance company (Markel International) issued a commercial general liability policy for the project and added Centex as an additional insured. *Id.* Driving home from work after his shift, an Alpha Contractors' employee (Bielawsky) collided with another driver on a road abutting (but not a part of) the Centex worksite. *Id.* Both drivers blamed Centex's overgrown

shrubbery as the culprit. *Id.* at *2. The question thus facing the court in the subsequent insurance suit was whether the car-crash injuries arose from Bielawsky's work and operations as a mason. *Id.* at *5. The court concluded that they did not because the underlying conduct occurred when Bielawsky was both off duty and off site—meaning the injuries could not bear a substantial nexus to Bielawsky's masonry work. *Id.* at *6. Returning to the case before the Special Master, he rejected any analogy to *Markel International* because the interplay between the shareholders' injury and the Valeant shares were markedly more straightforward: "The Allergan Plaintiffs emphasized the fact that following Valeant's announced tender offer, . . . the price for Allergan shares rose sharply." (R. & R. 52 (citing Second Am. Compl. ¶ 130).)

The Special Master also rebuffed the Objectors' argument that only harm to Valeant securities could give rise to a substantial nexus between Valeant stock and its misconduct—another way of saying that the role of Valeant shares was "merely incidental." (*Id.* at 55-56.) According to the Special Master, "the involvement of Valeant stock was significantly greater than merely incidental." (*Id.* at 55.) For example, the Relationship Agreement contained several clauses pertaining to Valeant securities, including a $400 million financing option that was payable in Valeant shares at Valeant's option. (*Id.* at 55 n.23.) Further, the Special Master resorted to the plain language of the AIG Policy, which contained no provision requiring harm to Valeant securities for coverage. (*Id.* at 56.) For good measure, the Special Master also reasoned that "had the insurers intended to limit coverage offered to damage caused to the *insured's stock* with respect to an offer to buy or sell such stock, they certainly knew how to tailor the definition of 'Securities Claims' to do so." (*Id.*) Indeed, one example from a coverage provision in an insurance policy in *Alstrin v. St. Paul Mercury Insurance Co.* (the "*Alstrin* Policy") "required that the alleged

Wrongful Act have been committed in connection with the sale or offer to sell securities of the insured to the claimant." (*Id.* at 57 (citing 179 F. Supp. 2d 376, 396 (D. Del. 2002)).)

Rounding out his topline conclusions regarding the AIG Policy, the Special Master concluded that the Underlying Complaint's claims pertain to an "offer to . . . sell" Valeant securities. (*Id.* at 58-64.) Here, the Objectors contended that the exchange offer was really an offer to purchase Allergan securities, not one to sell Valeant shares. The Special Master disagreed, distilling several authorities to determine that an unaccepted exchange offer qualified as an offer to sell securities. For one, the Exchange Act itself defines "sale" to include "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(14); *see also Northland Cap. Corp. v. Silver*, 735 F.2d 1421, 1433 (D.C. Cir. 1984) ("In the [Securities Act of 1933] Congress explicitly provided that 'sale' includes any 'disposition of . . . an interest in a security for value." (quoting 15 U.S.C. § 77b(3))). Moreover, the SEC's Financial Reporting Manual reveals that the "first sale" of common equity securities for emerging growth companies is broadly defined: "This phrase is not limited to a company's initial primary offering of common equity securities for cash. It could also include registered offerings of common equity pursuant to an exchange offer, merger, employee benefit plan on a Form S-8, and selling shareholder's secondary offering on resale registration statements." SEC Financial Reporting Manual § 10110.3 (2022).[11] The Special Master also cited

---

[11] An emerging growth company ("EGC") is an issuer with less than $1 billion in annual gross revenues. 15 U.S.C. § 77b(19). EGC status is coveted because it affords companies less rigorous reporting under the federal securities laws. *See Emerging Growth Companies*, Sec. & Exch. Comm'n, https://www.sec.gov/education/smallbusiness/goingpublic/EGC (last modified Apr. 28, 2022). The date and definition of an EGC's first sale of equity securities are thus significant because EGC status can dry up after five years of that first sale. *See* 15 U.S.C. § 77b(19)(B) ("An issuer that is an emerging growth company as of the first day of that fiscal year shall continue to be deemed an emerging growth company until the earliest of . . . the last day of the fiscal year of the issuer following the fifth anniversary of the date of the first sale of common equity securities of the issuer pursuant to an effective registration statement under this subchapter.").

persuasive cases that noted that exchange offers involve simultaneous sales. *See, e.g., Ruud v. Friendshuh*, No. 14-1735, 2015 WL 868039, at *4 (D. Minn. Feb. 27, 2015) ("An exchange, by its very nature cannot only involve a single, unilateral purchase as Plaintiffs seem to try to argue—it involves two transactions.").[12]

### 2.     The Special Master Rejects the Objectors' Counterarguments.

Completing his Report, the Special Master dismissed three additional counterarguments by the Objectors. *First*, he cast off that mandating coverage for Valeant's exchange-offer scheme created a moral hazard. (R. & R. 64-69.) The Objectors conjectured that coverage for Valeant's conduct could lead insured companies to offer their securities as sham consideration in otherwise all-cash tender offers. (*Id.* at 68-69.) Factually, the Special Master found no support for such conjecture in the record, particularly where the Underlying Complaint alleged that Valeant was cash poor and where the exchange offer included a near one-to-one share exchange. (*Id.* ("Nor has it been alleged that Valeant included its stock in its tender offer for the purpose of triggering insurance coverage.").) Legally, the Special Master also concluded that the Objectors' reliance on *Liss v. Federal Insurance Co.* was misplaced because that decision was factually inapposite and twice rebuffed by the New Jersey Appellate Division. (*Id.* at 66-68 & n.26 (citing No. MRS-L-1845-01, 2004 WL 5663962 (N.J. Super. Ct. Law Div. June 29, 2004), *rev'd*, 2006 WL 2844468 (N.J. Super. Ct. App. Div. Oct. 6, 2006) (per curiam); 2009 WL 231992 (N.J. Super. Ct. App. Div. Feb. 3, 2009) (per curiam)).)

---

[12] The Special Master also discarded the Objectors' argument that the conduct in the Underlying Complaint could not qualify as a securities claim because Allergan did not accept the exchange offer. As the Special Master stated, "[t]he definition of a 'Securities Claim' covers not only claims for the purchase or sale of Valeant securities but also includes an '*offer* to purchase or sell any securities of' Valeant." (R. & R. 63.)

*Second*, the Special Master concluded that coverage did not turn on whether the Underlying Complaint's class period encompassed Valeant's tender offer. (*Id.* at 69-71.) Indeed, that argument "overlooks, or at best glosses over the very essence of a Williams Act claim." (*Id.* at 69.) Relying on Williams Act jurisprudence, the Special Master discerned that the core conduct Congress sought to snuff out was the information asymmetry faced by shareholder recipients of tender offers. (*Id.* at 69-70 ("It is precisely this lack of pertinent knowledge[] (that is known to others)[] that creates the complained[-]of harm.").) Accordingly, "the class period in a Williams Act claim can never encompass the date the tender offer became public" and a post-class-period tender offer is immaterial to resolution on the pleadings. (*Id.* at 70 (listing cases).)

*Finally*, the Special Master reiterated his position that coverage survived notwithstanding the Objectors' hypothetical refrain that Valeant could have offered an all-cash tender offer. (*Id.* at 71.) As the Special Master reasoned,

> [w]hether or not Valeant could have funded the tender offer with cash is not a disputed material fact precluding the entry of judgment. Nor is it of any moment or practical significance, as it is undisputed that Valeant's tender offer did, in fact, include the exchange of Valeant stock for Allergan stock.

(*Id.*)

## II.    **STANDARD OF REVIEW**

The Court reviews findings of fact and conclusions of law in the Special Master's reports and recommendations *de novo*. Fed. R. Civ. P. 53(f)(3)-(4); (Order Appointing Special Master ¶¶ 8-9, ECF No. 197.) The Court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1); (Order Appointing Special Master ¶ 8.)

III.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standards governing Rule 12(c) motions are the same ones that govern motions to dismiss under Rule 12(b)(6)." *Allah v. Hayman*, 442 F. App'x 632, 635 (3d Cir. 2011) (citing *Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004)). "Like Rule 12(b)(6), Rule 12(c) requires the Court [to] 'accept the allegations in the complaint as true[] and draw all reasonable factual inferences in favor of the plaintiff.'" *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 324 (D.N.J. 1999) (quoting *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). A court may grant a motion for judgment on the pleadings only if the movant "clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citation omitted).

IV.   **DISCUSSION**

The parties ask the Court to determine the contractual definition of "Securities Claim" in the AIG Policy as that term relates to the Williams Act. Despite the prevalence of that term in insurance contracts, the parties agree that no prior court has clearly answered this question. The Court accordingly proceeds in two parts. With an eye toward the Special Master's thorough findings, it first interprets the term "Securities Claim" in the AIG Policy. It then addresses the Objectors' four main objections to the Special Master's Report. As stated below, this two-step leads the Court to conclude that the claims asserted in the Underlying Complaint are "Securities Claims" under the AIG Policy.

A.   **The Allergan Shareholders Assert "Securities Claims" Under the AIG Policy.**

Settled principles of contract interpretation drive the Court's analysis. To start, the plain text of the insurance contract controls, and courts afford each word in the contract its plain,

ordinary meaning. *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (quoting *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 933 (N.J. 2005)). "If the policy language is clear, the policy should be interpreted as written, but if the policy is ambiguous, the policy will be construed in favor of the insured." *Id.* (alterations and citation omitted). Further, courts strive to adopt interpretations that comport with the reasonable expectations of the transacting parties and particularly the insured. *See Doto v. Russo*, 659 A.2d 1371, 1376-77 (N.J. 1995)). Notably, however, the preference for the insured in ambiguous policies loses steam when the insured is a sophisticated entity. *See Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1103 (N.J. 2004) ("An exception to that rule exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract."). In any event, applying these standards, like the Special Master, the Court discerns five relevant requirements for a "Securities Claim" in the AIG Policy: (1) the claim must pertain to the securities of an "Organization"; (2) the claim must assert "any violation of law"; (3) the claim must be brought by "any person or entity"; (4) the violation of law must "alleg[e], arise from, [be] based upon, or [be] attributable to" securities of an Organization; and (5) the claim must pertain to the "purchase or sale or offer to purchase or sell" securities of the Organization. The Court addresses each in turn.[13]

### 1.    "Organization"

*First*, as the Special Master found, the AIG Policy unambiguously defines the term Organization. In the Definitions section, the AIG Policy defines Organization to mean, as relevant here, the Named Entity and each Subsidiary. (Policy *33.) The Named Entity is Valeant. (*Id.* at

---

[13] To avoid the punctuational mess, the Court minimizes quotation marks and brackets for the forthcoming language in the AIG Policy. Readers should assume that capitalized terms appear as such in the AIG Policy, unless otherwise defined.

*8.) In addition, the AIG Policy defines Subsidiary as "any for-profit entity that is not formed as a partnership of which [Valeant] has or had Management Control on or before the inception of the Policy Period either directly or indirectly through one or more of its other Subsidiaries." (*Id.* at *36.) That definition encompasses both Valeant USA and AGMS, Inc.—the entity Valeant set up "to buy and hold Allergan shares acquired through the tender offer." (Second Am. Compl. ¶¶ 27-28, 163.) The term Organization thus unambiguously refers to the Valeant Entities.

## 2. "Violation of Any Law"

*Second*, under the original version of the AIG Policy, a Securities Claim must allege "a violation of any federal, provincial, territorial, state, local or foreign regulation, rule or statute regulating securities." (Policy *36.) Endorsement #21, however, entitled "Securities Claim Definition – Common Law," modified this language to embrace common law claims. (Policy *68 (amending definition to "a violation of any law, rule or regulation, *whether statutory or common law*" (emphasis added)).) The broad language of Endorsement #21 applies to the claims in the Underlying Complaint. The Underlying Complaint asserts three separate violations under the Exchange Act—one under the antifraud provision of the Williams Act in section 14(e), another for control-person liability under section 20A, and a final under the insider-trading private right of action under section 20(a). (*See* Second Am. Compl. ¶¶ 196-226.) In addition, the Underlying Complaint's Williams Act claim implicates Rule 14e-3, the anti-warehousing rule promulgated by the SEC in interpreting the Exchange Act. (*E.g.*, *id.* ¶¶ 199-201.) These alleged violations fall under the broad ambit of violations of *any* law, rule, or regulation in the AIG Policy.

## 3. "Any Person or Entity"

*Third*, similarly broad language applies to those bringing Securities Claims—"any person or entity." Unquestionably then, former shareholders of Allergan qualify as any person. *See HUD v. Rucker*, 535 U.S. 125, 131 (2002) ("[T]he word 'any' has an expansive meaning, that is, one or

some indiscriminately of whatever kind." (citation omitted)); *cf. Maraziti v. Corigliano*, 101 A.2d 559, 563 (N.J. Super. Ct. App. Div. 1953) (analyzing the term "any person" in real estate broker statute as "not limited" and encompassing buyers and sellers of real estate). Notably, the parties do not pinpoint any exclusion or limit in the AIG Policy that would prevent non-Valeant personnel from asserting Securities Claims. The Allergan shareholders are thus qualifying persons under the AIG Policy.

### 4.      "Alleging, Arising Out Of, Based Upon or Attributable To"

*Fourth*, the Court considers what the AIG Policy means by the critical clause "alleging, arising out of, based upon or attributable to." The heart of this dispute, this relational clause links the violation of law to the Valeant securities; the question is what precisely is that link? Answering that question requires the Court to carefully examine the text of the relational clause and the authorities interpreting similar clauses in other insurance contracts.

But first, start with the obvious: the AIG Policy lists the four items disjunctively. That means that the claims in the Underlying Complaint can qualify as Securities Claims if they satisfy any one of the four terms. *See Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 158 (3d Cir. 2009) (interpreting the clause "the alleged conduct or any related conduct" to mean either type of conduct); *State v. County of Ocean*, 266 A.3d 433, 437 (N.J. Super. Ct. App. Div. 2021) ("[T]he word 'or' in a statute is to be considered a disjunctive particle indicating an alternative." (alteration in original) (quoting *In re Est. of Fisher*, 128 A.3d 203, 211 (N.J. Super. Ct. App. Div. 2015))). Similarly, each item in a disjunctive list must carry a distinct meaning; any contrary reading would lead to needless surplusage and violate the command that the Court give effect to every word in an insurance policy. *See Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973) (noting as a "well-settled principle[]" that "[a] contract is to be considered as a whole, and, if possible, all its provisions should be given effect"); *United States ex rel. Bookwalter v.*

*UPMC*, 938 F.3d 397, 409 (3d Cir.) ("Faced with two readings, one of which gives each phrase in a disjunctive list an operative meaning and another that makes a phrase surplus, we should follow the 'elementary canon of construction' against surplusage." (citations omitted)), *rev'd en banc on other grounds*, 946 F.3d 162 (3d Cir. 2019). The Court thus analyzes each of the four terms to determine whether the violations of law in the Underlying Complaint allege, arise out of, are based upon, or are attributable to Valeant securities.

a.        *"Alleging" and "Based Upon or Attributable To"*

The Court begins with the terms that the parties discuss least. Neither the AIG Policy nor caselaw provide much elucidation on three of the terms, "alleging," "based upon," and "attributable to." When an insurance policy is silent, courts often turn to dictionaries in search of plain meaning. *See Cypress Point Condo. Ass'n v. Adria Towers, LLC*, 143 A.3d 273, 286 (N.J. 2016). According to the Oxford English Dictionary, to allege means "[t]o claim (something unproven) as true; to assert or affirm without proof, or pending proof; to make an allegation about someone or something . . . frequently with reference to illicit or illegal behaviour." *Allege*, Oxford English Dictionary (3d ed. 2012) (last updated Dec. 2021). Similarly, it defines the passive verb base to mean "to place *on* (also *upon*) a foundation, fundamental principle, or underlying basis." *Base*, Oxford English Dictionary (3d ed. 2011) (last updated Dec. 2021). It further defines the adjective attributable as "[c]apable of being attributed or ascribed, [especially] as owing to, produced by." *Attributable*, Oxford English Dictionary (2d ed. 1989) (last updated June 2018). As the AIG Policy makes clear, the drafters used all three terms transitively, meaning all three require objects to round out their meaning.

Applying the plain meaning of "allege," the Underlying Complaint alleges Valeant securities. Notably, the definition for allege does not bake in the notion that the object of that transitive verb (here Valeant securities) must predominate to afford the verb meaning. Said another

31

way, one can allege something without that thing being the principal assertion or claim. The dictionary of course suggests that a complete meaning of the verb allege corresponds with an "illicit or illegal" object. But the dictionary also clarifies that such description is neither necessary nor essential but instead frequent and referential. That distinction is critical here: although the Underlying Complaint no doubt alleges conduct affecting Allergan shareholders and Allergan securities, it also alleges that Valeant employed its shares to further its illicit takeover of Allergan. It alleges that Valeant and Pershing schemed up a contemplated exchange offer as early as February 2014, meaning that the pair knew that any tender offer would likely contain a sizeable portion of Valeant shares. It further claims as true that Valeant securities were components of the Relationship Agreement itself—alleging, for example, that Pershing would finance up to $400 million in Valeant shares of any takeover attempt of Allergan at Valeant's discretion. To be sure, all these allegations are tied up in the Underlying Complaint's core assertions that Valeant and Pershing violated the Exchange Act and SEC reporting rules by hiding from the market knowledge of Valeant's forthcoming exchange offer and knowledge of the Valeant-Pershing warehousing scheme.

For similar reasons, the Underlying Complaint is also based upon and attributable to Valeant securities. Contrasted with "allege," these terms imply a closer relationship between the underlying violation of law and the Valeant shares: the term "based upon" demands a fundamental principle or underlying basis as its object, while "attributable to" requests an audience with an object that is produced by or owed to the violation of law. *See Sealed Air Corp. v. Royal Indem. Co.*, 961 A.2d 1195, 1205 (N.J. Super. Ct. App. Div. 2008) (defining base as "[t]he fundamental principle or underlying concept of a system or theory; a basis" (alteration in original) (quoting *Base*, American Heritage Dictionary (4th ed. 2006))). Even still, the Court is satisfied that the

Underlying Complaint meets these definitional challenges. Foundationally, the Williams Act and insider-trading causes of action concern the lack of disclosure of the covert Relationship Agreement and the contemplated exchange offer to Allergan shareholders, both of which heavily implicate Valeant shares. Indeed, without either of those ingredients, the Underlying Complaint's warehousing theory founders because Valeant would not have disclosed its securities-rich exchange offer to Pershing, and Pershing would not have warehoused Allergan shares in anticipation of Valeant's exchange offer. The Court accordingly concludes that the violation of law has an underlying basis in and is owed to Valeant shares.

The Court recognizes the opacity inherent in high-minded grammatical concepts like transitive verbs and object clauses. That difficulty is overcome by resort to common sense (or at least common sense with the benefit of some knowledge of securities law). Likely no one would say the Underlying Complaint fails to *allege* facts about Valeant securities; the Underlying Complaint carefully outlines the steps leading to Valeant's stock-for-stock exchange offer and discusses $400 million in Valeant securities as a critical financing option in the Relationship Agreement. Nor would anyone likely say that Williams Act liability is not *based upon* or *attributable to* Valeant's stock-for-stock exchange offer. To say so would be nonsensical—the Williams Act and subsequently promulgated SEC rules sprung up precisely to combat fraud and insider trading associated with tender offers. Grammar aside, common sense leads to the same conclusion: the underlying violations of law allege, are based upon, and are attributable to Valeant shares.

One note of caution, however. The Court emphasizes that none of this grammatical or common-sense analysis should suggest that the AIG Policy's use of these terms is so broad as to capture only fleeting references to securities. That interpretation would almost certainly exceed

the reasonable expectations of the insured even where the policy terms were unambiguous. *See Werner Indus., Inc. v. First State Ins. Co.*, 548 A.2d 188, 191 (N.J. 1988) ("[E]ven an unambiguous contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured . . . ."). Thus, allegations about securities that are factually unnecessary or that add only background detail will likely not rise to the level of qualifying securities claims. For example, an employee discrimination lawsuit would not necessarily morph into a covered securities claim under a D&O liability insurance policy just because the employee alleged that he or she had stock options. Nor would a breach-of-fiduciary-duty claim mutate into one for securities by virtue of some ill-fated corporate opportunity that happened to involve securities. *See In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 576 (Del. 2019) ("[F]iduciary duty claims do not depend on a security being involved."). In those cases, although the underlying complaints undoubtedly allege securities, those allegations would be beyond the insured's *reasonable* expectations of coverage. As in the discrimination example, the employee's stock options generally have nothing to do with whether the employer discriminated against him or her. Nor do securities in a corporate opportunity relate to a board's underlying breach, which instead has everything to do with the relationship of trust between the board and its shareholders. *Cf. Foodtown, Inc.*, 2008 WL 3887617, at *6) ("But the mere mention of a contract does [not] create a claim alleging, arising out of, based upon or attributable to any actual or alleged contractual

liability.").[14] Simply put, unlike here, the securities in those scenarios bear virtually no relationship to the underlying violations of law.

      b.     *"Arising Out Of"*

That brings the Court to the term the parties bicker most about, "arising out of." Unlike with the prior three terms, abundant New Jersey caselaw exists on the meaning of "arising out of" to guide the Court's analysis.

> The critical phrase "arising out of," which frequently appears in insurance policies, has been interpreted expansively by New Jersey courts in insurance coverage litigation. "The phrase 'arising out of' has been defined broadly in other insurance coverage decisions to mean conduct 'originating from,' 'growing out of' or having a 'substantial nexus' with the activity for which coverage is provided.

*Am. Motorists Ins. Co.*, 713 A.2d at 1010 (listing cases). Two cases illustrate this breadth. In *Westchester Fire Insurance Co. v. Continental Insurance Cos.*, a minor seated in the backseat of a car threw out the car's window a piece of wood with a nail in it, impaling a nearby infant. 312 A.2d 664, 666 (N.J. Super. Ct. App. Div. 1973). The infant's parents sued the car's driver (also a minor), whose parents then sought coverage from the automobile insurance company. *Id.* The automobile insurance policy provided coverage for bodily injuries "arising out of . . . use of the owned automobile." *Id.* at 667. Interpreting the term "arising out of," the court began by rejecting the insurer's argument that the term "must be interpreted to require a showing of causality between the injury and the use [of the automobile] before coverage exists." *Id.* at 668. For the court, a

---

[14] The Court recognizes its substantive alteration to the quote but is confident the alteration is what the drafter intended. In *Foodtown, Inc.*, the insurer argued that its policy excluded coverage for a breach-of-fiduciary-duty claim because that claim alleged, arose out of, was based on, or was attributable to a breach of contract (which the policy expressly excluded coverage for). 2008 WL 3887617, at *5. Rejecting that contention, the court reasoned that allegations about the contract in the underlying complaint were "evidence of concreteness[] and . . . particularity" of the breach-of-fiduciary-duty claim and not "the actual basis of the claim." *Id.* at *6.

construction equating the term with proximate cause "would do equal violence to the normal meaning" of arising out of—especially because the policy did not "clearly convey[] the idea of proximate cause" through clauses such as "caused by" or "resulting from." *Id.* at 669. Rather, the court need only find "a substantial nexus between the injury and the use of the vehicle," focusing on "whether the negligent act which caused the injury, although not foreseen or expected, was in the contemplation of the parties to the insurance contract." *Id.* Under that standard, the court concluded that items being thrown from a moving car were "sufficiently foreseeable consequence[s]" of vehicle use to warrant coverage. *Id.*

The New Jersey Appellate Division repeated this standard in a more recent case. There, Hudson County hired a general contractor, Malpere Enterprises, Inc. ("Malpere"), to restore the William Brennan Courthouse in Jersey City. *County of Hudson v. Selective Ins. Co.*, 752 A.2d 849, 850 (N.J. Super. Ct. App. Div. 2000). Before the restoration project started, Malpere hired a subcontracting company (All Jersey Seamless Company), which sent an employee to the courthouse to learn more about the bidding process. *Id.* at 851. In that venture, however, the employee fell down the slippery marble steps of the courthouse's basement staircase. *Id.* Facing a coverage claim, the insurer disputed that the phrase "liability arising out of 'your work'" in its commercial general liability policy covered the employee's injuries because Malpere did not direct the employee nor had Hudson County yet awarded the subcontracting bid to All Jersey Seamless Company. *Id.* at 853. The court disagreed, reasoning that both Hudson County and its insurer could have reasonably anticipated that Malpere would hire subcontractors, that those subcontractors would have employees, and that unsafe conditions at the courthouse—even if "unexpected and unforeseen"—might cause personal injuries. *Id.* at 854. Thus, the employee's "presence at the

worksite, and the ensuing accident, was sufficiently connected to Malpere's 'work' for the County

to constitute a 'substantial nexus' between the contract and the contractor's 'work.'" *Id.*

Like the term "allege," however, "arising out of" is not so broad as to render the term

limitless. The Court has already recited, for example, the peculiar facts of *Markel International*,

where the court refused to read a clause that covered injuries arising out of workplace operations

to cover injuries occurring both offsite and after hours. *See supra*, Section I.F.1. Add to the mix

cases like *Sealed Air*, a case with a sprawling, multi-part fact pattern. 961 A.2d at 1197-1201. That

case concerned the meaning of "arising out of . . . [p]ollutants" in an exclusion provision in a D&O

liability policy. *Id.* at 1201. Back in the day, a company called W.R. Grace & Co. (Old Grace for

short) incurred hundreds of millions of dollars in asbestos liabilities after it acquired a fireproofing

and mining company. *Id.* at 1197. To dodge those liabilities, Old Grace reorganized through a

series of transactions resembling the Texas two-step, whereby it transferred its asbestos tort

liabilities to a newly spun-off subsidiary (New Grace) and maintained its assets and equity in a

newly merged company called Sealed Air Corporation ("Sealed Air"). *Id.* at 1198. Spurred on by

a pre-merger report from Old Grace's independent auditor, both Old Grace and Sealed Air

represented to the market that New Grace would remain solvent notwithstanding the stress the tort

liabilities put on the nascent company. *Id.* at 1198-99. Specifically, the independent auditor

reaffirmed New Grace's financial health given that Old Grace had received assurances that several

law firms would stop filing asbestos lawsuits. *Id.* at 1198. Contrary to those assurances, however,

the lawsuits did not stop and New Grace filed for bankruptcy. *Id.* at 1199. The ensuing bankruptcy

litigation revealed that Old Grace's transfer of liabilities may have been fraudulent, prompting the

federal bankruptcy court to rule that Old Grace improperly valued New Grace's contingent

liabilities. *Id.* That ruling caused Old Grace's stock price to plunge, based on investor fears that

the bankruptcy court could unwind the Texas two-step and saddle Sealed Air with New Grace's contingent liabilities. *Id.* Securities litigation against Sealed Air unsurprisingly ensued. *Id.* at 1199-1200.

In the subsequent indemnification suit, Sealed Air's insurer argued that the exclusion clause in the D&O liability policy barred coverage because the securities litigation arose from Old Grace's prior asbestos contamination. *Id.* at 1202. The court summed up why the clause did not:

> Here, the underlying litigation arose from allegedly false and misleading representations and omissions pertaining to whether Sealed Air properly evaluated certain contingent liabilities regarding potential pollution liability claims which were to remain with a subsidiary to be spun off. Reading the complaint in this case, it is clear to us that the gravamen of the securities holders' complaint has its root in securities fraud and misrepresentation, not pollution.

*Id.* at 1204. Indeed, the court noted that "too many intervening events" occurred that linked the underlying asbestos pollution to the security holders' damages—which stemmed from artificially inflated stock prices and not pollution. *Id.* at 1205-06. To name a few: (1) Old Grace polluted after acquiring an asbestos-contaminating company; (2) then Old Grace transferred liabilities from those pollution suits to New Grace; (3) then Old Grace spun-off New Grace and merged with Sealed Air; (4) then Old Grace's independent auditor improperly valued New Grace's contingent liabilities; (5) then Old Grace and Sealed Air misrepresented New Grace's liabilities to the market; (6) then New Grace declared bankruptcy; (7) then creditors asserted that Old Grace's transfer of liabilities was fraudulent; (8) then the bankruptcy judge ruled that Sealed Air misvalued New Grace's contingent liabilities; and (9) then Sealed Air's stock price plummeted. *See id.* at 1205. To put it bluntly, nine steps from pollution to shareholder injury was not a "substantial nexus."

Putting all these cases together, the Court must analyze the nature of the relationship between the violations of law and the Valeant shares. Is that relationship more akin to the one between the discarded piece of wood and the bystander injury in *Westchester*? The one between

the subcontracting work and the basement slip-and-fall in *County of Hudson*? Or is it more like the attenuated relationships between the contracting work and the afterhours accident in *Markel International* or the asbestos pollution and the securities violations in *Sealed Air*? The Court concludes that this case comfortably aligns with *Westchester* and *County of Hudson*. Both cases buttress that the relationship encompasses more than proximate cause, meaning that Valeant shares need not have caused or produced the underlying Williams Act and insider-trading claims. Rather, so long as the parties could have reasonably foreseen that Valeant would decide to employ its shares to acquire Allergan, any natural and probable violations of law stemming from that decision qualify as Securities Claims. In other words, a Williams Act claim arises from securities when the insurer could reasonably contemplate that the insured would tender an exchange offer that includes those securities. That is precisely the upshot of *Westchester* and *County of Hudson*; undoubtedly, the insurers there likely never contemplated that an infant would be impaled by a defenestrated piece of wood or that a non-party subcontractor would fall down basement stairs. What mattered instead was whether the insurers could foresee that a passenger could throw an item from a window or that the insured could hire subcontractors. *See Westchester*, 312 A.2d at 669 ("In our mobile society the act of throwing or dropping objects from moving vehicles is not such an uncommon phenomenon that such occurrence may not be anticipated, nor so inconsequential that members of the public need no financial protection from the consequences thereof."); *County of Hudson*, 752 A.2d at 854 ("[The insurer] could reasonably anticipate that Malpere would use subcontractors to perform its work and that such subcontractors would send representatives to the worksite in preparation for submitting their bids.").

So too here. The Objectors could reasonably contemplate that Valeant would furnish an exchange offer to acquire any competitor, including Allergan. The Underlying Complaint provides

the Court with ample support for the reasonableness of that contemplation. For one, Valeant had a track record of gobbling up competitors. (Second Am. Compl. ¶¶ 31-32 (alleging that Valeant engaged in a "growth-by-acquisition strategy" employing "highly-leveraged financing structures").) That strategy further left Valeant cash-poor and debt-rich—meaning equity financing was a highly logical alternative to continue feeding its acquisition-driven machine. (*See, e.g., id.* ¶ 69 ("As reflected in an internal February 18, 2014 email, Valeant's senior executives knew the company had 'neither sufficient available cash nor borrowing capacity to acquire [a] meaningful toe-hold position' in Allergan in the first part of 2014.").) Notably, with Allergan specifically, the Underlying Complaint alleges that Allergan had publicly rebuffed Valeant's advances; any subsequent relationship would therefore be hostile. (*E.g., id.* ¶ 86 ("[O]n February 10, 2014, analysts from Sanford B. Bernstein & Co. published a report on their meetings with Allergan's senior management, which had informed Bernstein that the companies had 'very different business models,' were '[n]ot a good fit,' and that 'shareholders w[ould] hesitate to take Valeant paper.'"); *id.* ¶ 89 ("Allergan's known enmity towards a transaction with Valeant was also clearly set forth in Valeant's own internal documents, which confirm that Defendants always knew hostile tactics—including a tender offer—would be necessary.").) And unsurprisingly, the Underlying Complaint is awash with references that Valeant would eventually employ an offer that hawked Valeant stock to Allergan shareholders at an almost one-to-one exchange ratio. (*E.g.,* Second Am. Compl. ¶ 96 (summarizing February 2014 Valeant communications discussing the "hostile cash and stock merger" (alteration and emphasis omitted)).) Indeed, Valeant's opening bid for Allergan derived almost seventy percent of its value from Valeant shares. (*See id.* ¶ 126.)

Buoying the Court's conclusion are the terms of the Relationship Agreement, which reveal that Valeant and Pershing contemplated Valeant's securities as a source of funds in any offer for

Allergan. The Relationship Agreement provided that, at Valeant's discretion, Pershing would purchase $400 million in discounted Valeant shares to help Valeant acquire Allergan. That provision makes sense only if Valeant contemplated needing more cash (which it ultimately did) to acquire Allergan. Given the company's debt load, Valeant weaponized the only asset it had to get that cash—*its equity securities.* (*See, e.g., id.* ¶ 34 ("Indeed, while Valeant has set ambitious acquisition and growth targets for itself for years, by early 2014 when it started its assault on Allergan, financing to fund its acquisitions was becoming scarce.").) In fact, in many respects, the economic incentives of the Relationship Agreement make sense only if viewed with Valeant's stock in mind. Would Valeant have negotiated for a fifteen-percent return of Pershing's insider-trading profits if it knew that it would make an all-cash tender offer to Allergan shareholders? Likely not, as that would be no different than a small discount on that tender offer when what Valeant really needed was more cash. Would Pershing have purchased long-term options on Allergan shares if it knew that Valeant would offer an all-cash tender offer to Allergan shareholders? Likely not, as Pershing knew that Valeant would struggle to attain financing for an all-cash offer, thereby imperiling the value of its options. All to say that the illicit Relationship Agreement's plain terms strongly suggest that Valeant and Pershing countenanced a securities component in any tender offer Valeant made to Allergan shareholders.

Nor is the relationship between Valeant's shares and the Williams Act so unrelated as to be unforeseeable to an insurer. The Williams Act and the subsequent SEC rules came around to combat the misconduct alleged in the Underlying Complaint—that is, the fraud and warehousing associated with tender offerors that know more than the market does. *See Piper*, 430 U.S. at 26 ("This legislation will close a significant gap in investor protection under the Federal securities laws by requiring the disclosure of pertinent information to stockholders when persons seek to

obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities." (quoting 113 Cong. Rec. 854 (1967) (statement of Sen. Harrison Williams)). True, the Objectors likely could not have foreseen precisely how Valeant would violate the Williams Act by concealing knowledge of its tender offer's financing terms through a covert agreement with an assemblage of hedge funds. But neither could an insurer foresee exactly what item a passenger would eject from a car, nor which unsafe conditions lurked in the courthouse's basement. *See Westchester*, 312 A.2d at 669 ("In our view, although [the passenger's] act in throwing the stick from the automobile may not have been foreseen or expected, it was a sufficiently foreseeable consequence of the use of the vehicle to mandate coverage under the terms of the policies."); *County of Hudson*, 752 A.2d at 854 ("That the premises might be unsafe due to an '[un]expected and [un]foreseen' dangerous condition is, in the contemplation of [the insurer], a natural and reasonable incident of the 'work,' and, therefore, a risk against which [it] might reasonably expect the County to be protected." (first and second alterations in original) (citation omitted)). Indeed, the *means* in which an insured carries out a violation of law take a backseat to the *foreseeable consequences* of those means. So long as the Objectors could have reasonably contemplated that Valeant would use its shares to acquire a competitor, the Court can conclude that any Williams Act violation stemming from those shares would be a risk Valeant expected to be insured against.

Nor does this case harken back to the bespoke, multi-step fact patterns of *Markel International* and *Sealed Air*. As the Court's lengthy recitation of the facts of those cases makes clear, both cases illustrate that intervening events defeated any reasonable connection between the injury and the underlying covered or excluded activity. In *Markel International*, an employee of the insured travelled offsite and afterhours and got into a car accident—activity unrelated to work

or operations of the insured. In *Sealed Air*, litigation arose from deceptive SEC filings after a bankruptcy court ruling caused the insured's stock to plummet—activity again wholly unconnected to the insured's underlying asbestos pollution.[15] Here, no intervening events disturb the relationship between the Valeant securities and the underlying violation of law because the Williams Act claim grows out of Valeant's contemplated exchange offer and Valeant's use of that knowledge to manipulate Allergan stock. *See Am. Motorists Ins. Co.*, 713 A.2d at 1010 ("The phrase 'arising out of' has been defined broadly in other insurance coverage decisions to mean conduct 'originating from,' 'growing out of' or having a 'substantial nexus' with the activity for which coverage is provided." (citations omitted)). Indeed, unlike the Tolkienesque backstories between conduct and injury in *Markel International* and *Sealed Air*, the Court can sum up the factual relationship between the Valeant shares and the underlying violations of law in one sentence: Valeant withheld knowledge of its contemplated exchange offer from the market to the detriment of Allergan shareholders.[16]

The Court understands that the density of this subject matter may impede understanding. To help, it sums up its analogical reasoning in five bullets below:

- *This case*: Do the violations of law arise from Valeant securities?
  Yes, because the insurer could reasonably contemplate that Valeant

---

[15] Notably, *Sealed Air* is distinguishable for a separate reason. In that case, the court analyzed an exclusion provision whereas here the Court analyzes one for coverage. New Jersey courts tend to construe exclusion provisions in insurance contracts narrowly. *See Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.*, 46 A.3d 1272, 1277 (N.J. 2012) ("[C]overage provisions are to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations.").

[16] Contrast this with the one-sentence challenge for the convoluted and clause-laden relationships necessary for coverage in *Markel International* or exclusion in *Sealed Air*. An attempt at the former: an employee of Alpha Contractors (itself an employee of Centex), Bielawsky, shortly after his shift and just outside Centex's worksite, collided with another driver, causing injury to a passenger, based on overgrown shrubbery at the Centex worksite.

would use its shares in an exchange offer, and the Williams Act is a natural and probable exchange-offer violation.

- *Westchester*: Does injury arise from use of the vehicle? Yes, because the insurer could reasonably contemplate that car passengers would throw items out windows, and bystander injuries are a natural and probable consequence of those thrown items.

- *County of Hudson*: Does injury arise from work at the Brennan Courthouse? Yes, because the insurer could reasonably contemplate that the insured would hire subcontractors for that work, and unsafe worksite conditions are a natural and probable consequence of that work.

- *Markel International*: Does injury arise from work or operations at the worksite? No, because the insurer could not reasonably contemplate that insured's subcontractor's employee's car would crash afterhours and off-site.

- *Sealed Air*: Does injury arise from asbestos pollution? No, because the insurer could not reasonably contemplate that a bankruptcy judge would potentially unwind a series of business transactions that could saddle the insured with asbestos contingent liabilities.

Accordingly, on this logic and these facts, the Objectors could have reasonably contemplated that Valeant would tender its shares in exchange for Allergan shares and that Williams Act liability was a foreseeable consequence of that exchange. The Court expresses no opinion on whether a Williams Act claim could arise from an all-cash tender offer or any other hypothetical offer under the AIG Policy. Those scenarios are neither before this Court nor appropriate for consideration. *See Westchester*, 312 A.2d at 669 ("Whether the requisite connection or degree of relationship exists depends upon *the circumstances of the particular case*." (emphasis added)).

### 5. "Offer to Purchase or Sell"

*Finally*, the Court concludes that the Underlying Complaint concerns an offer to sell Valeant securities. No question exists that Valeant made an offer: indeed, the crux of the Underlying Complaint is Valeant's exchange offer. The parties instead focus on the closer question of what the offer was for. As the Objectors see it, Valeant's offer was one to purchase *Allergan*

*shares* from the Allergan shareholders. For the Valeant Entities, the offer was to sell *Valeant shares* to those shareholders. As the syntax suggests, only the Valeant Entities' interpretation qualifies as a Securities Claim under the AIG Policy because only that formulation captures the necessary ingredient of Valeant securities. The critical inquiry thus becomes whether an "offer to . . . sell" unambiguously encompasses an exchange of Valeant shares for Allergan shares.

The Court is not without guidance on this question. As the Special Master noted, both the Securities Act and the Exchange Act define the term "sale" and "sell" broadly. The Exchange Act provides that "[t]he terms 'sale' and 'sell' each include *any* contract to sell or *otherwise dispose of.*" 15 U.S.C. § 78c(a)(14) (emphases added). The Securities Act—which Congress based the Exchange Act on—provides similarly:

> [t]he term "sale" or "sell" shall include *every* contract of sale or *disposition of a security* or interest in a security, for value. The term "offer to sell", "offer for sale", or "offer" shall include *every* attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

15 U.S.C. § 77b(a)(3) (emphases added); *see also Lawrence v. SEC*, 398 F.2d 276, 280 (1st Cir. 1968) ("We have no reason to believe that Congress intended, one year after the passage of the Securities Act, to dilute the concept of 'sale' in the Securities Exchange Act. The 'otherwise dispose of' language . . . [is] 'hardly limiting.'" (citations omitted) (quoting *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 634 (2d Cir. 1967))); *Nat'l Bank of Com. of Dall. v. All Am. Assur. Co.*, 583 F.2d 1295, 1298 (5th Cir. 1978) ("Although there are slight differences in wording between the 1933 Securities Act and the 1934 Securities Exchange Act, the definitions of ['purchase' and 'sale'] are functionally equivalent . . . .").

Considering these broad definitions, the Court easily concludes that an exchange offer is "any contract to sell or otherwise dispose of" Valeant stock. The exchange offer offered fractional shares of Valeant stock for sale to Allergan shareholders. The consideration for the sale of

Valeant's securities was the Allergan shareholders' shares. Valeant no doubt knew this because, by filing its S-4 Registration Statement, it recognized that the securities in its exchange offer required registration for an offer to sell. Indeed, failure to register those securities for sale would violate federal law. *See* 15 U.S.C. § 77e(c) ("It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to *offer to sell* or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . ." (emphasis added)).

The Objectors' contrary position rests on a false premise that any transaction must have only a single purchaser and only a single seller. That position is understandable as, from a capital markets perspective, the exchange offer appears as a single transaction between a tender offeror and shareholder offerees. The practical reality of any exchange, however, reflects that both transacting parties can be "purchasers" or "sellers." To this point, *Ruud v. Friendshuh* is on all fours. That case involved a transaction that exchanged annuities, one of which qualified as a covered federal security and another which did not. *Ruud*, 2015 WL 868039, at *4. Attempting to fend off federal preemption, the plaintiffs argued that the exchange centered on the purchase of the uncovered security rather than the sale of the covered federal security. *Id.* at *3. The court rejected that convoluted parsing of the exchange transaction, reasoning that the exchange was really two transactions: "the exchange involved the 'surrender' of one annuity and the acquisition of a new one in its place." *Id.* at *4. "Put simply, as alleged, the transaction . . . indisputably involved and required the surrender of variable annuities—covered securities—and was therefore 'in connection with the purchase or sale of a covered security.'" *Id.* The logic of *Ruud* equally applies here. From Valeant's perspective, the exchange offer involved two components, first the

sale of Valeant shares to Allergan shareholders and second the purchase of Allergan shares. Valeant acted thus as *both* purchaser *and* seller.

A simple hypothetical further reveals the flaws in the Objectors' approach. Suppose a freshly minted lawyer buys a new sedan for $20,000 in cash from a car dealership. Common sense dictates that a single transaction with cash as the sole transacting currency occurred: for $20,000, the lawyer bought and the dealership sold the sedan. Considering this fact pattern, the Objectors might be onto something. Absent a penchant for laughter, no one would say that the dealership purchased $20,000 or that the lawyer sold $20,000. But assume instead a fact pattern closer to this case—the lawyer buys the new car for $10,000 in cash and $10,000 in a traded-in SUV. In addition to buying the sedan, the once all-cash buyer is now also selling an SUV in exchange for the sedan. So, two transactions must occur: the first, the lawyer buying and the dealership selling the new sedan, and the second, the lawyer selling and the dealership buying the old SUV. That the lawyer is driving away in a new car does not render him or her the sole transactional "purchaser"; indeed, from the dealership's perspective, it also purchased an old SUV for $10,000.

So too here.

### B.   The Court Largely Overrules the Objectors' Objections But Slightly Winnows the Scope of the Special Master's Report.

Next, the Court addresses the Objectors' objections to the Special Master's Report. The Objectors raise four objections: (1) the Special Master erroneously concluded that the Valeant Entities' claims were "Covered Claims"; (2) the Special Master erroneously concluded that the Valeant Entities' claims were "Securities Claims"; (3) the Special Master relied on facts outside the pleadings; and (4) the Special Master erroneously concluded that coverage would not lead to a moral hazard. (Objectors' Moving Br. 2-3.) The Court has already addressed many of these

47

arguments in its analysis above and will not rehash those parries. With that in mind, the Court addresses each of the remaining Objectors' objections in turn.

### 1.      The Court Limits Judgment to Resolution of "Securities Claims."

First up, the Objectors object to the following sentence in the Special Master's Report: "I am satisfied that the claims alleged by the Allergan Plaintiffs do, indeed, fall within the definition of 'Securities Claims' under the Policies, and as such, constitute covered claims." (R. & R. 72.) According to the Objectors, the Special Master reached one conclusion too many by weighing in on what a "covered claim" is. (Objectors' Moving Br. 17 ("Allianz respectfully submits that the R&R mistakenly 'concludes' that coverage exists under the Insurers' Policies, objects to any such conclusion and requests that the Court not adopt any recommendation regarding the broader issue of 'coverage.'").) The Valeant Entities contend that the Objectors are making much ado about nothing but, in all events, do not contest limiting the Report to a conclusion about "Securities Claims" only. (Pls.' Opp'n Br. 17-18, ECF No. 288.)

The Court agrees with the Valeant Entities that the Objectors' requested clarification appears pedantic. The parties moved for partial judgment on the pleadings on Count V of the Complaint, which seeks a declaration that the AIG Policy provides that the insider-trading litigation is a "covered Securities Claim[]" against the Valeant Entities and a "covered Claim[]" against Pearson. (Compl. ¶ 118.) At oral argument, in response to argument that "a ruling . . . on the definition of securities claim does not determine a broader finding of coverage," the Special Master confirmed that his rulings would not "end the case." (June 3, 2021 Oral Argument Tr. 142:5-17.) Outside the rulings on moral hazard (which the Court will get to later), the Report did not substantively address any broader affirmative defenses to coverage or other potential exclusions to coverage in the AIG Policy. Nor did the parties brief their motions that way. To the extent the Special Master's Report can be read to address or deny the Objectors' affirmative

defenses (which the Court strongly doubts it does), the Court limits the Report's conclusions to reach the definition of "Securities Claims" only.

### 2. The Court Overrules the Objections to the Special Master's Conclusions Regarding "Securities Claims."

Next, the Objectors lodge their meatiest objection: that the Special Master got it wrong by concluding that the insider-trading litigation constituted a Securities Claim. At bottom, the Objectors' arguments all boil down to the same point—that Valeant securities are too attenuated from the Allergan shareholders' overall theory of liability under the Williams Act. That argument is not without merit. As stated earlier, the Underlying Complaint does not allege a garden-variety securities fraud that involves manipulation of the issuer's securities. The Court thus carefully examines the Objectors' arguments.

*First*, the Objectors contend somewhat self-evidently that the AIG Policy does not provide "unlimited coverage." (Objectors' Moving Br. 18, ECF No. 272.) Tautology aside, what the Objectors really argue is that insurance companies will not cover "claims that merely reference securities" when those claims are "outside the contemplated insured risk" and "beyond what the parties bargained and paid for." (*Id.* at 19.) In other words, according to the Objectors, the Underlying Complaint did not arise from the Valeant securities because they never imagined that Valeant would employ its shares illicitly. Notably, in many respects, that argument ignores the other three provisions of the disjunctive clause (allege, based upon, or attributable to) of the AIG Policy that all unambiguously give rise to coverage. Regardless, the Court has already explained why the Objectors could have reasonably contemplated the violations of law in the Underlying Complaint and need not exhaust its "arising out of" analysis again here. *See supra* Section IV.A.4.b.

Indeed, a careful review of the Objectors' cited caselaw reaffirms the wisdom of the Court's decision. The Objectors rely heavily on five cases, only one of which applies New Jersey law, and none of which squarely address the requisite relationship for Securities Claims. (*See* Objectors' Moving Br. 19-20.) The first is *In re Verizon Insurance Coverage Appeals*, where the Delaware Supreme Court determined that a D&O liability policy did not cover several common law torts because the definition of Securities Claims did not extend to common law claims. 222 A.3d at 575, 580. Needless to say, that case is distinct because here Endorsement #21 expressly covers common law claims, and the Underlying Complaint asserts statutory claims only. Even if the case were factually on point, however, it supports the Court's interpretation, not the Objectors'. At one point, Verizon argued that the phrase "regulating securities" meant "involving securities." Slapping that argument down, the Delaware Supreme Court reasoned that "Verizon's interpretation of 'regulating securities' is also duplicative of a separate requirement of a Securities Claim that the claim either *arise from* a 'purchase or sale' of securities or be brought 'by a security holder.'" *Verizon Ins. Coverage Appeals*, 222 A.3d at 579 (emphasis added). That logic makes sense only if the Delaware Supreme Court adopted a broad reading of the terms "arise" and "sale," as the Court does here. Indeed, the court's concern was that the limitation of "regulating securities" would become meaningless if it meant "involving securities" because violations of law arising out of securities transactions must already *involve* securities. *See id.* at 575 ("Because the Securities Claim definition separately establishes a connection to a securities transaction, then regulations,

rules, or statutes must be directed specifically towards securities laws for "regulating securities" to have meaning in the definition.").[17]

The same factual flaw plagues two more of the Objectors' cases. In *XL Specialty Insurance Co. v. Loral Space & Communications, Inc.*, the New York Appellate Division interpreted the clause "violation of any federal, state, local regulation, statute or rule regulating securities" and concluded that the clause did not cover common law breach-of-fiduciary-duty claims. 918 N.Y.S.2d 57, 64 (App. Div. 2011). Another unpublished case from Oregon interpreted the same clause and concluded that claims for breach of contract and civil conspiracy did not assert independent violations of federal securities laws. *Kollman v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 04-3106, 2007 WL 2344825, at *3-4 (D. Or. Aug. 13, 2007), *aff'd*, 542 F. App'x 649 (9th Cir. 2013). In stark contrast, here the Underlying Complaint asserts violations of the federal securities laws that expressly regulate tender offers and pinpoints violative conduct that involves Valeant securities. The Ninth Circuit's unpublished, three-paragraph memorandum affirmance of the *Kollman* case changes nothing as it mimics the district court's reasoning. *See Kollman v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 542 F. App'x 649, 649 (9th Cir. 2013) (mem.) ("The complaint alleged breach of contract, breach of fiduciary duty, conspiracy, and similar claims, not violations of securities laws.").

---

[17] Notably, the at-issue policy in *Verizon Insurance Coverage Appeals* was markedly narrower than the AIG Policy. There, the coverage clause applied to violations of law that "regulat[ed] securities," which the court reasoned must be narrower than "laws not specifically directed toward securities." *Verizon Ins. Coverage Appeals*, 222 A.3d at 579 n.84. Otherwise, the clause would rope in conduct that "would make any unlawful conduct committed during a securities-related transaction fall within the Securities Claim definition." *Id.* That clause is absent from the AIG Policy, signifying that the transacting parties intended broader coverage that could extend to laws not specifically directed toward securities.

The final two cases cited by the Objectors are slightly more analogous but still offer no reprieve. In *Federal Insurance Co. v. Campbell Soup Co.*, the New Jersey Appellate Division opined that a lawsuit stemming from a self-dealing transaction between a corporation and its subsidiary was not one arising out of the purchase or sale of securities. 885 A.2d 465, 470 (N.J. Super. Ct. App. Div. 2005). Because the underlying complaint alleged a "transfer[] between a corporation and its wholly owned subsidiary," it could not allege a "sale or purchase of securities." *Id.* Notably, however, the court's focus was not on the meaning of "arising out of" but rather that term's object, "purchase or sale of securities." As the underlying complaint did not allege a securities transaction—much less any two-party transaction—the court reasoned that it could not have arisen from that transaction. *See id.* ("Like the securities law, those definitions expressly require or imply a transaction with another entity or person, not with oneself. When [the corporation] dealt with [its subsidiary], it was dealing with itself, however the transaction was structured."). For similar reasons, the Objectors' reliance on another Ninth Circuit memorandum affirmance is misplaced. There, the Ninth Circuit affirmed the district court's ruling that mortgage-backed securities claims were not ones arising out of securities of the issuer because the term "securities of" meant "shares in," not, as the insurers argued, securities sold by the issuer. *Impac Mortg. Holdings, Inc. v. Hous. Cas. Co.*, 634 F. App'x 614, 615 (9th Cir. 2016) (mem.). The Ninth Circuit did not weigh in on the requisite relationship between the securities and the underlying losses; instead, it concluded that the securities were not the type envisioned by the contracting parties. The problem, therefore, lied in the object clause ("securities of") not the critical relational clause ("alleging, arising out of, based upon or attributable to"). None of these cases convince the Court that its interpretation of that clause is wrong.

*Second*, the Objectors rehash their argument that the securities component of Valeant's tender offer is irrelevant to the Allergan shareholder's theory of liability. (Objectors' Moving Br. 21 ("The specific terms of any possible future tender offer, or how Valeant planned to pay for such an offer, were not relevant to Allergan Plaintiffs' theory of liability. Allergan Plaintiffs' theory of liability was not that Valeant offered or sold Valeant securities, but that Valeant hid from the public—while sharing with Pershing—its future plans to acquire Allergan." (emphases omitted)).) The Court disagrees. For one, the Objectors cite no law that their theory-of-liability test supplants the broad standard New Jersey courts employ for coverage provisions and the terms "allege," "arise out of," "based upon," and "attributable to," in particular. *See Am. Motorists Ins. Co.*, 713 A.2d at 1010. Good reason exists to doubt that New Jersey courts would use a test that relies on lawyer-crafted theories and whichever causes of action plaintiffs choose to bring. As stated above, in *Westchester*, the court rejected a test that interpreted "arising out of" to mean "proximately caused," signifying the concern that the requisite relationship ought to be *factual* rather than *legal*. *See* 312 A.2d at 668-69. And notably, the Appellate Division did not blink at the underlying lawsuit involving causes of action that had nothing to do with the discarded piece of wood. *See id.* at 666 (noting that the underlying complaint asserted negligence claims against the driver's and passenger's parents for "negligence in the care, control and discipline of their child"). The Court thus strains to adopt a theory-of-liability yardstick by which to measure the relationship between the Valeant shares and the violations of law.

Even so, the Court is satisfied that the Valeant securities are sufficiently related to the Allergan shareholders' theories of liability. As stated above, the purpose of the Williams Act was to correct the information asymmetry between tender offerors and target shareholders by mandating disclosure. A critical part of that information was the terms of the offer, precisely why

the disclosure regime mandated by the Williams Act includes "the source and amount of funds or other consideration to be used in making the purchases" and "the offeror's plans with respect to the target corporation's business or corporate structure." *Piper*, 430 U.S. at 22-23 (quoting 15 U.S.C. § 78m(d)); *see also* 15 U.S.C. § 78n(d)(1) (applying disclosure provisions of § 78m(d) to tender offerors). To that end, the SEC requires disclosure of all "[m]aterial terms" in any tender offer, including "[t]he type and amount of consideration offered to security holders," which encompasses the securities in Valeant's exchange offer. 17 C.F.R. § 229.1004(a)(1)(ii); *see also Applied Digit. Data Sys. Inc.*, 425 F. Supp. at 1154 ("[The antifraud provision of the Williams Act] would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are *under an obligation to make full disclosure of material information* to those with whom they deal." (emphasis added) (quoting S. Rep. 550, 90th Cong., 1st Sess. 2-3 (1967))).

Critically as well, the anti-warehousing rules kicked in once Valeant took "substantial steps" towards a tender offer. *See* 17 C.F.R. § 240.14e-3(a). That means that once Valeant took those steps, anyone with "material information" about the tender offer needed to disclose that information or abstain from trading on it. *See id.* All that to say that had Valeant acted lawfully, the market would have learned about the securities component in its contemplated exchange offer much earlier than April 22, 2014. Contrary to the Objectors' insistence, the lack of disclosure to the market of the exchange offer—which would have necessarily included its *material terms*— and the selective disclosure of the offer (with its terms) to Pershing is exactly what's at issue in the Underlying Complaint. (*See, e.g.*, Second Am. Compl. ¶ 12 (outlining the "substantial steps" Valeant took toward a tender offer); *id.* ¶ 201 ("The purpose of Rule 14e-3 is to prevent parties with nonpublic information relating to a tender offer as to which substantial steps have been taken

from transacting with investors who do not have such information, unless they disclose that information first and within a reasonable time prior to trading the relevant securities."); *id.* ¶ 202 ("After taking substantial steps to commence a tender offer for Allergan shares, Valeant unlawfully communicated material, nonpublic information relating to that tender offer to Pershing. Those communications were made under circumstances in which it was reasonably foreseeable that those communications were likely to result in a violation of Rule 14e-3."); *id.* ¶ 203 ("Following Valeant's communications, and without disclosing the material, nonpublic information, Pershing purchased or caused to be purchased over 28 million shares of Allergan stock while in possession of material, nonpublic information obtained from Valeant.").)

Relatedly, the Objectors also assert that coverage cannot extend to Williams Act claims because of—what they view as—a "temporal[] impossibil[ity]." (Objectors' Moving Br. 21.) For the Objectors, because the Class Period did not include the date in which Valeant delivered its opening offer to the Allergan shareholders, no exchange-offer liability may accrue. (*See id.* ("The Class Period began with Pershing's first acquisition of Allergan stock and ended before Valeant's public announcement of its takeover bid, deliberately carving out ties to any offer of, or purchase of, Valeant securities.").) But the Objectors' argument fundamentally misreads the Williams Act. Like section 10(b), Williams Act fraud liability may attach for any "fraudulent, deceptive, or manipulative acts or practices" conducted "*in connection with* any tender offer." 15 U.S.C. § 78n(e) (emphasis added). Thus, attempting to impose a temporal limit on Williams Act liability is, as one court put it, "not logically sound." *Applied Digit. Data Sys. Inc.*, 425 F. Supp. at 1153 ("There is no apparent reason why any given action may not be taken 'in connection with' a development reasonably certain to take place in the future"). Nor is the breadth of the Williams Act's fraud liability surprising as Congress's "primary purpose" in enacting the Williams Act was

to ensure that shareholders "would be provided with complete and truthful information about the offeror." *Id.* (citations omitted); *see also* R. & R. 70 (listing cases showing that Williams Act class periods always cover periods during which shareholders were at informational disadvantages).

*Third*, the Objectors repeat their argument that Valeant's exchange offer was not an offer to sell Valeant securities. (Objectors' Moving Br. 22-23.) Both the Court and the Special Master already rejected this argument, and the Objectors offer no new spin that the Special Master did not already persuasively consider. *See supra* Section IV.A.5; (R. & R. 58-64 (reasoning, among other deductions, that the Objectors' caselaw merely "describe[ed] the essential nature of a tender offer" and did not disprove that an exchange offeror is also a securities seller).)

*Fourth and finally*, the Objectors belabor that no substantial nexus between the Valeant securities and the Underlying Complaint exists. (Objectors' Moving Br. 23-28.) By now, the Court is confident that the nexus is apparent. And in all events, a substantial nexus is far from a requirement considering that the AIG Policy also covers violations of law that allege, are based upon, or are attributable to Valeant's securities. *See supra* Section IV.A.4.a.

> **3.     The Special Master Did Not Rely on Extrinsic Evidence in Reaching His Conclusions.**

The Objectors next assert that the Special Master's 75-page Report is infested with extrinsic evidence that a court may not consider at the judgment-on-the-pleadings stage. (Objectors' Moving Br. 28-33.) They first assert that the Special Master improperly relied on the *Alstrin* Policy, which they view as a harmful error. (*See id.* at 28-32.) It is not. The Special Master devoted a single paragraph in his well-reasoned Report to the *Alstrin* Policy, which he cited as an example from a publicly filed judicial decision. (R. & R. 56-57 (quoting 179 F. Supp. 2d at 396).) He used the *Alstrin* Policy to illustrate that the Objectors could have drafted a more narrowly tailored policy. (*Id.* at 57 ("This more narrowly drawn definition required that the alleged

Wrongful Act have been committed in connection with the sale or offer to sell securities of the insured to the claimant.").) On this analysis, the *Alstrin* Policy is not extrinsic evidence—or, in fact, evidence at all; it is prototypical judicial reasoning. (*See* Pls.' Opp'n Br. 33 ("This is the sort of comparing and contrasting that courts do all of the time (and the R&R could also have also made the same point without citing anything).").) Under the Objectors' view, any citation to some other insurance policy at the judgment-on-the-pleadings stage would preclude judgment. The Court declines to take that journey down the rabbit hole with the Objectors.

Reinforcing the Court's view is the common-sense notion that a one-paragraph reference to another policy is far from harmful to the Special Master's conclusions. Indeed, the Court can make the same point as the Special Master by referencing the AIG Policy only. The plain terms of the AIG Policy show that the policy drafters were capable of winnowing coverage. Take, for example, the following exclusion from the AIG Policy:

> Conduct Exclusion (a), above, shall not apply in a **Securities Claim** alleging violations of Section 130 or 130.1 of the Ontario Securities Act, as amended, or Section 11, 12, or 15 of the U.S. Securities Act of 1933, as amended, or similar statutory provisions of any Canadian federal, provincial or territorial securities law or foreign securities law, to the portion of any **Loss** attributable to such violations[.]

(Policy *14.) The plain language reveals that the drafters were familiar with how to carve out specific statutory claims. They could have, for example, excluded Williams Act claims, section 14 Exchange Act claims, and the like. That they did not furnishes some evidence that the drafters intended coverage to extend to the violations of law asserted in the Underlying Complaint. *See Meier v. N.J. Life Ins. Co.*, 503 A.2d 862, 869 (N.J. 1986) ("Insurance companies possess all the expertise and unilaterally prepare the varied and complex insurance policies.").

In a single paragraph of their own, the Objectors also agitate about the Special Master's judicial notice of a tentative summary judgment opinion in the underlying insider-trading

litigation. (Objectors' Moving Br. 32-33.) Specifically, the Objectors take issue with the Special Master's reliance on the "fact[] outside the pleadings" that Valeant was cash poor when it took substantial steps towards its tender offer. (*Id.*) The Court disagrees with the Objectors' characterization of the Special Master's Report. The Objectors cite no law explaining why the Special Master erred by taking judicial notice of the tentative opinion. Further, even without the tentative opinion, the Underlying Complaint more than alleges that Valeant was cash poor. (*See, e.g.*, Second Am. Compl. ¶ 69 (noting that by February 2014, Valeant knew it did not have enough money to purchase a toehold in Allergan and that its debt position made a hostile takeover bid "prohibitively expensive").) The "fact" that Valeant actually was cash poor is therefore irrelevant to the Special Master's conclusions.[18]

### 4.  The Special Master Erred by Prematurely Concluding that No Moral Hazards Exist.

Finally, the Court agrees with the Objectors that the Report took one step out of bounds by concluding that no moral hazard exists with coverage in this case. A moral hazard arises when insurance coverage encourages the insured to engage in risky behavior on the belief that the insurer will front the costs of the insured's recklessness. *See BOC Grp., Inc. v. Fed. Ins. Co.*, No. L-4271-03, 2007 WL 2162437, at *11 (N.J. Super. Ct. App. Div. July 30, 2007) (per curiam) (quoting *May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002) (Posner, J.)). It is primarily a public policy concern. *See, e.g.*, *McNeilab, Inc. v. N. River Ins. Co.*, 645 F. Supp. 525, 556 n.33 (D.N.J. 1986) (citing, as example of moral hazard, case where court "allowed a subrogation recovery against the insured by the insurer for intentional acts in order to vindicate the public policy that people should bear the consequences of their own acts in order to discourage wanton

---

[18] The Court also reiterates that it did not consider the tentative opinion in its decision today.

acts by an insured who knew he would not have to pay for any damage caused by him" (citing *Ambassador Ins. Co. v. Montes*, 388 A.2d 603 (N.J. 1978))); *Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1314 (D.N.J. 1995) ("Under the moral hazard argument, both a rational insurer and strong public policy would not provide coverage for the intentional discharge of pollution."), *rev'd in part on other grounds*, 124 F.3d 508 (3d Cir. 1997). On its face then, moral hazard arguments are best suited for summary judgment, where the Court will make a broader finding of coverage and consider affirmative defenses to that coverage.

The Court thus agrees that the Special Master's analysis regarding moral hazards was premature. Even the Valeant Entities appear to recognize the overreach. (June 3, 2021 Oral Argument Tr. 78:14-17 ("[Valeant's counsel:] My point . . . is these are motions on the pleadings and that's not a circumstance that should give rise to findings about moral hazards . . . .").) Although the Special Master's analysis is both thorough and persuasive, the Court finds it prudent to await the benefit of discovery to see if the Objectors' moral-hazard defense pans out. The Court notes, however, that given the Special Master's careful thought on this subject, it is skeptical that discovery will bear out that Valeant could have made an exchange offer with nominal shares or an all-cash offer. (*See* R. & R. 68-69 (noting that that nowhere does anyone allege "that Valeant included its stock in its tender offer for the purpose of triggering insurance coverage" and that near 1:1 exchange ratio "hardly bespeaks of the type of sham tender offer that might trigger a more solidly based 'moral hazard' argument").) What may be more fruitful (and may be contrary to New Jersey public policy) would be evidence that the Valeant Entities intentionally violated the securities laws with the intent to recover under their D&O liability policies. *See Ambassador*, 388 A.2d at 606 ("Were a person able to insure himself against the economic consequences of his intentional wrongdoing, the deterrence attributable to financial responsibility would be missing.

Further, as a matter of moral principle no person should be permitted to allege his own turpitude as a ground for recovery."); 1 New Appleman Insurance Law Practical Guide § 5.05[3] (2021) (discussing insurance in the context of intentional conduct).

## V.      CONCLUSION

Insurance policies are intricate instruments. They never intend to account for every conceivable accident or wrongdoing that the insured may face; indeed, insurers are actuarially familiar with how to quantify risk and policy premiums. This case, however, is not an exercise in conceivable coverage. Although this case is one of first impression, it is not a close call: it is a straightforward application of unambiguous contract terms. The claims asserted in the insider-trading litigation constitute Securities Claims under the AIG Policy. The Objectors may raise their affirmative defenses to coverage at a later time. The Court therefore grants the Valeant Entities' motion for judgment on the pleadings and denies Defendants' cross-motion for judgment on the pleadings. An appropriate order will follow.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE